306 Ga. 516
FINAL COPY

S19A0490.  McCAMMON v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Curtis McCammon was convicted of malice murder, attempted armed robbery, and a gun crime in connection with the shooting death of Nigel James. On appeal, he contends that the evidence presented at his trial was insufficient to support his convictions and that the trial court erred by denying his motion to exclude testimony about his purchase and use of marijuana and by admitting an exhibit that was not properly authenticated. We affirm.[1]

---

[1] James was killed on September 1, 2015. On December 4, 2015, a Newton County grand jury indicted Appellant for malice murder, two counts of felony murder, criminal attempt to commit armed robbery, aggravated assault, and possession of a firearm during the commission of a felony. Hentrez Reed and Areon Clemons were each separately indicted for similar crimes. Clemons entered a negotiated guilty plea and testified for the State at the joint trial of Appellant and Reed, which began on March 20, 2017. On March 22, the jury found them guilty on all counts. The trial court sentenced Appellant to serve life in prison for malice murder, 15 years for attempted armed robbery, and five years for the firearm offense. The felony murder counts were vacated, and the aggravated assault count merged. Appellant filed a timely motion for

1. (a) Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. According to Areon Clemons, on the afternoon of September 1, 2015, Appellant called Clemons to ask for a ride. Appellant and Clemons had been friends for about six months, during which the two men would "[s]moke weed, play basketball together, [and] burglarize houses." Appellant had just stolen some televisions and needed help transporting them. Clemons drove to meet Appellant in the Ellington residential community in Covington, and Appellant told him that Nigel James was coming to meet them to buy the stolen televisions. After James left the community with two televisions, Appellant and Clemons went to buy marijuana from a drug dealer they knew as "Dizzy." That evening, James called Appellant to say that he wanted some money back because one television was not the right size, and they

new trial, which he amended on April 13, 2018. The trial court denied the motion on June 22, 2018. Appellant then filed a timely notice of appeal, and the case was docketed in this Court for the April 2019 term and submitted for decision on the briefs. We note that Reed's appeal has been docketed in this Court for the August 2019 term as Case No. S19A1342.

2

agreed to meet at the community's pool house.[2]

On the way there in Clemons's car, Appellant told Clemons that he wanted to rob and kill James. Appellant had seen James with cash when James paid for the televisions earlier that day. Appellant told Clemons to stop at Hentrez Reed's house on the west side of the Ellington community so Appellant could get a gun. Reed was using drugs when they arrived. Reed then joined Appellant and Clemons, and Clemons drove to a street near the pool house, where they parked. The three men walked to the rear of the pool house to wait for James. As they waited, Reed showed Appellant how to use the gun and told him not to be scared. When James arrived, Clemons ran back to his car as Appellant and Reed walked toward James's car; the gun was in Appellant's hand. As Clemons ran, he heard several gunshots. Appellant and Reed then returned to Clemons's car; they apparently had not taken anything from James. As

---

[2] James's girlfriend testified that James told her that he bought the televisions from his friends "over in the Ellingtons." She did not know their real names. She said that when James realized that one of the televisions was too small, he told her that he was going back to meet with his friends to exchange it or get his money back.

Clemons drove away, Appellant and Reed said that they wanted to go rob Dizzy (the drug dealer) because they believed Dizzy would have cash they could steal. Clemons refused, however, and instead he dropped off Appellant and Reed at Reed's house and left.

James had been shot several times, but he managed to drive away from the pool house area toward the east side of the community. Minutes later, a teenager called 911 to report that a man was yelling for help, saying he had been shot, and banging on the front door of the teenager's home and neighbors' homes. Responding officers found James lying in the grass with a garden hose running water over his bleeding wounds. His car was stopped in the middle of the street with the engine still running; the car had blood and bullet holes in it. James told the officers that he had been shot near the bridge and the lake, which were next to the pool house. He asked the officers for his cell phone, indicating that it would have information about the shooter on it, but the officers could not find the cell phone at that time. James was taken to a hospital, but soon died. The police found about $1,300 in cash in James's belongings at

4

the hospital.

Eight days later, police officers arrested Appellant and Clemons as they were driving away from a house that they had just burglarized. In an interview with the police, Appellant admitted that he had sold stolen televisions to James and that James had called him later that day to get a refund for the television that was too small. After telling the police a variety of stories, Clemons confessed to his, Reed's, and Appellant's involvement in the murder. The officers then arrested Reed, who took them to his brother's house to recover the murder weapon, which Reed had hidden behind the washing machine.

According to Clemons, he and Appellant were in jail in adjoining cells and were talking when Appellant slid a one-page, handwritten document under the door to Clemons. On the front of the document was an affidavit stating (falsely) that Clemons had stolen the murder weapon from Reed's house without Reed's knowledge. On the back was a note indicating that Reed wanted Appellant to sign the affidavit, but that Appellant was not going to

do that. Clemons believed that Reed wrote the affidavit and that Appellant wrote the note on the back.[3] Clemons later entered a negotiated guilty plea to conspiracy to commit murder, attempted armed robbery, aggravated assault, and a gun crime, for which he

---

[3] The document is not included in the record, although there is a photograph of the note on the back. At trial, Clemons, whose nickname is "Too Tall," read the affidavit on the front of the document aloud for the jury as follows:

> [Y]our first and last name hereby does [s]tate the following: I . . . went to Mrs. Bennett's house, Reed['s] mom, to sell a flat-screen TV. Hentrez [Reed] opened the garage to take a look at the TV and see if it was working. So me and Too Tall put the TVs in the garage. After looking at the flat-screen, Reed went back into his mom's house[.] I noticed that Too Tall was going through bags and boxes inside the garage while Reed was in the house. After we left is when I noticed that Too Tall had taken the gun from the garage. At no time did Hentrez Reed know that Too Tall had took a firearm and neither did I mention anything to Reed about the firearm. A week or so after we had seen Reed, he, Reed, called looking for a firearm and that's when I told him . . . Too Tall had it and that I would . . . get it back from him. I called and asked Reed for his whereabouts. I took the firearm . . . back to Reed. At no time did Reed know anything about the firearm was in the crime. Neither did Reed know that Too Tall had taken the firearm from the garage only until he called and ask[ed] did we have it is when I told him Too Tall had taken it and I would get [it] back from him. . . . [U]nder penalty of perjury the foregoing is true and correct to the best of my knowledge.

The note on the back of the document, which Clemons also read to the jury, says: "This what Reed wanted me to write about you but I'm not gonna do it, I f**k with you bruh. What you gonna do about your statement[?] I'm thinking about going to trial[;] what you thinking about doing? Write me back whenever you can[.]"

was sentenced to serve a total of 10 years in prison followed by 25 years on probation. In exchange, Clemons testified for the State at Appellant and Reed's joint trial.

At the trial, the medical examiner who performed James's autopsy testified that James suffered five gunshot wounds — four to the left side of his torso and one to his right leg. Two of the wounds to his lower torso caused severe and ultimately fatal internal bleeding. Bullets recovered from James's body and from the crime scene matched the gun that Reed had hidden at his brother's house. Cell phone records showed that Appellant's and James's phones called each other three times just minutes before the murder, that Appellant's and Reed's phones were in the Ellington community area at the time of the murder, and that — although Appellant and Reed had no phone contact in the 11 days before the murder — Appellant's phone communicated with Reed's phone 36 times throughout the eight days between the murder and Appellant's arrest.

Appellant did not testify. His theory of defense was that no

physical evidence connected him to the murder and that Clemons was falsely accusing him in exchange for a lesser sentence.

(b) Appellant contends that the evidence was legally insufficient to support his convictions because it was based entirely on Clemons's testimony as his accomplice, which lacked corroboration and was not credible. We disagree.

> In order to sustain a conviction, testimony by an accomplice to the crime must be corroborated by other evidence implicating the defendant. OCGA § 24-14-8; *Crawford v. State*, 294 Ga. 898, 900-901 (757 SE2d 102) (2014). Corroborating evidence may be slight, and may be entirely circumstantial. See *Robinson v. State*, 303 Ga. 321, 322-323 (812 SE2d 232) (2018). "The evidence 'need not be sufficient in and of itself to warrant a conviction, so long as it is independent of the accomplice's testimony and directly connects the defendant to the crime or leads to the inference of guilt.'" Id. at 323 (quoting *Parks v. State*, 302 Ga. 345, 348 (806 SE2d 529) (2017)). "[E]vidence of the defendant's conduct before and after the crime was committed may give rise to an inference that he participated in the crime." *Cisneros v. State*, 299 Ga. 841, 845 (792 SE2d 326) (2016) (citation and punctuation omitted). Once the State has introduced independent evidence implicating the defendant, it is for the jury to decide whether the accomplice's testimony has been sufficiently corroborated. Id.

*Mangram v. State*, 304 Ga. 213, 216 (817 SE2d 682) (2018).

8

In this case, Clemons's accomplice testimony about Appellant's participation in James's murder was adequately corroborated by independent evidence. Appellant admitted that he sold stolen televisions to James on the day of the murder and that James called him later that day to ask for a refund for the television that was too small. James's girlfriend testified that he told her that he was going back to "the Ellingtons" to meet the people who had sold him the televisions to ask for a refund. Cell phone records showed that Appellant and James then were in contact three times just minutes before the shooting — and James told the police as he lay dying that his cell phone would point the officers to the shooter. The phone records also showed that Appellant's and Reed's phones were in the area at the time of the shooting and that, after having no phone contact with Reed in the 11 days before the murder, Appellant communicated with Reed — who had the murder weapon — at least 36 times in the days after the murder. Although circumstantial, this independent evidence was more than slight, and it was adequate for the jury to infer Appellant's participation in the crimes. See

*Mangram*, 304 Ga. at 216. See also *Crawford*, 294 Ga. at 901-902 (holding that cell phone records — the only independent evidence specifically implicating the defendant — were sufficient circumstantial evidence to authorize the jury to determine that the accomplice's testimony was corroborated).

And as a matter of constitutional due process, although Appellant argues that Clemons was not a credible witness, "'[i]t was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) (citation omitted). When viewed properly in the light most favorable to the verdicts, the evidence presented at trial and summarized above was legally sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also OCGA § 16-2-20 (a) ("Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime.").

2. Appellant contends that the trial court erred by denying his pretrial motion to exclude evidence of his purchase and use of marijuana, because that evidence was not intrinsic to the charged crimes and was not used for a proper purpose under OCGA § 24-4-404 (b). We see no abuse of discretion in the trial court's ruling because the evidence was intrinsic. See *McCray v. State*, 301 Ga. 241, 249 (799 SE2d 206) (2017).

As we have explained before:

> The limitations and prohibitions on "other acts" evidence set out in OCGA § 24-4-404 (b) do not apply to "intrinsic evidence." . . . Evidence is admissible as intrinsic evidence when it is "(1) an uncharged offense arising from the same transaction or series of transactions as the charged offense; (2) necessary to 'complete the story of the crime'; or (3) 'inextricably intertwined with the evidence regarding the charged offense.'" Intrinsic evidence must also satisfy [OCGA § 24-4-403].
>
> In applying these factors, the Eleventh Circuit has noted that evidence "pertaining to the chain of events explaining the context, motive, and set-up of the crime is properly admitted if [it is] linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." The court went on to explain that evidence of other acts is "inextricably intertwined" with the evidence regarding

11

the charged offense if it forms an "integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted." And this sort of intrinsic evidence remains admissible "even if it incidentally places [the defendant's] character at issue."

*Williams v. State*, 302 Ga. 474, 485-486 (807 SE2d 350) (2017) (citations and footnote omitted).

At trial, Clemons testified that he and Appellant purchased marijuana from "Dizzy" in the hours between their two encounters with James, and that immediately after Appellant and Reed shot but failed to steal any money from James, they turned to the idea of robbing Dizzy because they believed that he would have cash they could steal. Appellant and Clemons's activities together that day and Appellant and Reed's desire to continue their criminal activities and complete an armed robbery were "'an integral and natural part of an account'" of the charged crimes. Id. at 485 (citation omitted). And explaining who Dizzy was and why Appellant believed that Dizzy — like James — would have cash to steal was "'necessary to complete the story of the crime for the jury.'" Id. at 485-486 (citation

omitted). As the trial court found in denying Appellant's motion in limine, this evidence was "interwoven during the whole course of the day of criminality that was occurring." Thus, the court did not abuse its discretion in admitting this evidence. See, e.g., *Smith v. State*, 302 Ga. 717, 725-726 (808 SE2d 661) (2017) (holding that portions of the defendant's statement to the police that referred to his drug use were properly admitted as intrinsic evidence because they "formed an integral and natural part of his account of the circumstances surrounding the offenses for which he was indicted").

Clemons also testified that he and Appellant smoked marijuana during their six months of friendship before the murder. While this testimony was further afield from the charged crimes, it was a natural part of Clemons's account of his relationship with Appellant, it was mentioned only twice in passing (once when Appellant's counsel had Clemons confirm the testimony on cross-examination), and it was hardly prejudicial in comparison to Clemons's accompanying testimony — about which Appellant does not complain on appeal — that he and Appellant also burglarized

13

homes together. We cannot say that the trial court abused its discretion in this regard either. See *Brewner v. State*, 302 Ga. 6, 14 n.3 (804 SE2d 94) (2017). Accordingly, this enumeration fails.

3. Finally, Appellant contends that the trial court erred by admitting the "affidavit" document, see footnote 3 above, because it was not properly authenticated. At trial, the court admitted the document over Appellant's objection after Clemons testified that the note on the back "look[ed] like [Appellant's] handwriting." On cross-examination, however, Clemons admitted that he had never seen Appellant write anything by hand and did not actually know that Appellant had written the note. Appellant argues that the State therefore failed to carry its burden to authenticate the document under OCGA § 24-9-901. We disagree.

"Under OCGA § 24-9-901 (a), authentication of evidence may be achieved through any of a variety of means affording 'evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *Brewner*, 302 Ga. at 16 (quoting that statute).

Authentication may be achieved through many means,

including, but not limited to: "[t]estimony of a witness with knowledge that a matter is what it is claimed to be"; "[n]onexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation"; and, "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances."

*Smith v. State*, 300 Ga. 538, 540-541 (796 SE2d 666) (2017) (quoting

OCGA § 24-9-901 (b) (1), (2), and (4)).

> The party proffering the evidence must present sufficient evidence to make out a prima facie case that the proffered evidence is what it purports to be. Once that prima facie case is established, the evidence is admitted and the ultimate question of authenticity is decided by the jury.

Id. at 541 (citations and punctuation omitted).

Clemons testified that he believed Appellant wrote the note on the back of the document because he was "talk[ing] to [Appellant] through the door" as it was passed to him. See *Smith*, 300 Ga. at 341 (affirming authentication of letters written by Smith because, among other things, the co-indictee witness "testified that many of the letters were either given to him by Smith, or were delivered by a third party at Smith's request"). The unsigned affidavit on the front of the document referred to key facts in the case including the

15

source of the murder weapon, stolen televisions, Reed's full name, Reed's mother's name, and Clemons's nickname, and Appellant's note on the back referred to Reed and the upcoming trial. See id. ("[T]he content of the letters referenced information concerning the case, including potential witnesses, evidence, and even included an affidavit for [the co-indictee] to sign stating that Smith was not involved in the crimes."). Thus, even if Clemons was not familiar with Appellant's handwriting, the references in the document and the circumstances in which Clemons received it authorized the court to find that the State had properly authenticated the note. See *Brown v. State*, 332 Ga. App. 635, 639-640 (774 SE2d 708) (2015).

*Judgment affirmed. All the Justices concur.*

DECIDED AUGUST 19, 2019.

Murder. Newton Superior Court. Before Judge Ott.

*Jennifer F. Arndt*, for appellant.

*Layla H. Zon, District Attorney, Amber R. Bennett, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Katherine D. Emerson, Assistant Attorney General*, for appellee.