307 Ga. 657
FINAL COPY

S19A1572.  HARRIS v. THE STATE.

ELLINGTON, Justice.

A Cobb County jury found Ricardo Harris guilty of murder and concealing the death of another in connection with the death of Yvonne James.[1] Harris contends that the trial court erred in admitting his pre-trial statements into evidence and that trial counsel was ineffective for allowing him to give an incriminating custodial statement. For the reasons that follow, we affirm the judgment of conviction.

---

[1] On March 28, 2013, a Cobb County grand jury indicted Harris for malice murder, felony murder, aggravated battery, and concealing the death of another in connection with the January 1, 2013 death of James. Following a trial from June 22 to 26, 2015, the jury found Harris guilty on all counts. On July 24, 2015, the trial court sentenced Harris to life imprisonment for murder and to ten years consecutive imprisonment for concealing a death. The remaining counts were either merged or vacated by operation of law. On August 21, 2015, Harris filed a motion for a new trial through new counsel, who filed an amended motion and brief in support of the motion on December 21, 2018. The trial court held a hearing on the motion and denied it on February 6, 2019. Harris filed a notice of appeal on February 28, 2019.  The appeal was docketed to the August 2019 term and submitted for decision on the briefs.

Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed the following. James was a sex worker. Ancil Neil advertised James' services on social media sites and acted as her agent. Neil and James had a routine for communicating about clients: Neil procured the clients and then informed James via text message when a client was on the way. James texted Neil when a client arrived and when he was about to leave. She would also text Neil if she needed his protection. On December 27, 2012, Neil rented a room in James' name for a week at a hotel in Cobb County.

On December 31, Harris, who is deaf, sent text messages to Neil, and the two negotiated a price for sex acts. Harris was not informed that he was texting with Neil, as Neil pretended to be James. Unbeknownst to Harris, Neil watched from his car in the hotel parking lot as Harris arrived at the hotel just prior to 4:00 a.m. on January 1, 2013. Neil sent Harris a text with James' hotel room number, then he informed James that Harris was approaching her room. Shortly thereafter, James confirmed that Harris had arrived

and that he had brought her some brandy. While Harris was in James' room, Neil sat in his car where he had a "clear, unobserved view" of the exterior of James' room. At 4:40 a.m., Neil received a text from James, stating that she was "getting dressed," which meant that Harris was about to leave. When Neil did not see Harris leave the room as expected, he grew concerned. He texted James several times during the following hour, but she did not respond.

According to Neil, Harris peered from behind the blinds of James' room at 5:40 a.m. Moments later, Harris walked from the hotel room to his car, where he put something in his trunk. Harris then walked to the hotel lobby. While in the lobby, Harris wrote something on a piece of paper and handed it to the front desk clerk. Neil went to the hotel room to find out what was going on. There, he found James, submerged in a bathtub filled with red-tinged water. She had a pillow over her head. As Neil pulled James from the tub and tried to revive her, Harris re-entered the room. Neil could not fully understand what Harris was saying, but thought he said: "I sorry; accident; dead." Neil ran to the front office and told the desk

clerk that someone had killed his girlfriend. While talking to the clerk, Neil saw Harris driving away and pointed toward Harris' white car. Time stamps on the hotel security video showed Neil at the front desk at 5:55 a.m. Harris drove across the street, where he asked a gas station employee to dial 911 while he waited for the police to arrive. Neil went back to the hotel room, removed several items from it, and left.

Responding officers found James' body on the floor. They saw wounds on her face and body. The officers noted damage to the hotel room, including holes in the walls. Having been advised that a 911 caller was waiting at the gas station across the street, an officer drove there and brought Harris to the hotel. When the officers attempted to speak with Harris, Harris indicated that he was deaf. Officer Figueroa took out his notepad and asked Harris if he could read and write. Harris indicated that he could. Figueroa wrote questions and asked Harris to write answers. Finding the process time-consuming, Figueroa got a laptop computer from his patrol car and asked Harris to type out the answers to his questions.

4

Figueroa testified that, at this point, he believed Harris was a witness; therefore, he did not advise him of his rights. In response to the officer's questions, Harris typed the following account. He went to see the victim for sex. As soon as he entered the room, he found her dead, lying in the tub with a pillow over her face. He walked to the hotel's front desk and asked them to call police, but they refused. He decided he should drive somewhere to have someone else call the police. As he returned to his car, he saw a man seated in a nearby car. Harris asked the man for help. The man got out of his car, went to the hotel room, and pulled the victim out of the bathtub. But then the man stole the victim's phone and left. Thereafter Harris drove across the street to the gas station and asked an employee to call the police. After giving this typed account, Harris went with an officer to police headquarters to give a more formal statement.

Shortly after Harris left, Detective Mark Erion arrived at the hotel and spoke with Figueroa. Erion reviewed the handwritten and typed statements that Figueroa had taken down in his initial contact

with Harris. Even though it was New Year's Day and interpreters were difficult to find, Erion enlisted the services of sign language interpreter Barbara Bell, who also worked as a dispatcher for the Southern Polytechnic Police Department. Bell met Erion at the police station. With Bell's assistance, the detective informed Harris of his *Miranda*[2] rights. Erion testified that, although he read Harris his rights, Harris was not under arrest and was being treated as a witness. Harris also read and signed a waiver-of-rights form. Through the interpreter, Erion told Harris that he was following up on Harris' 911 call and wanted to know what he had seen. Harris repeated what he had told Figueroa and reduced his statement to writing.

During a break in the interview, Erion had a chance to review the hotel surveillance video recording. He noticed that the time stamps on the recording did not match Harris' account of events. The recording showed Harris arriving at James' room at 4:03 a.m., but

---

[2] See *Miranda v. Arizona*, 384 U. S. 436, 444 (86 SCt 1602, 16 LE2d 694) (1966).

not leaving the room to go to the lobby until 5:37 a.m. According to Erion, when he confronted Harris with that information, Harris seemed surprised and confused. At that point, Erion stopped the interview and arrested Harris for concealing the death of another.

When Harris was arrested, he was wearing a beaded necklace. Officers found a bead on the hotel room floor similar to Harris' beaded jewelry. James wore no beaded jewelry. After obtaining search warrants for Harris' home and car, officers found a bottle of brandy in the trunk of Harris' car. The search of Harris' residence yielded several necklaces with beads. The officers also recovered a cell phone image from Harris' phone that had been taken the night before the murder. It showed him wearing a beaded bracelet.

According to the Cobb County medical examiner, James had injuries consistent with having been struck with a blunt object or fist. She had been struck so hard that a small bead with a wrinkled, cracked finish similar to Harris' beaded necklace had become embedded in her face. The medical examiner opined that the injuries to the victim's body were akin to her being shoved into or through a

7

wall. He determined that the cause of death was a homicide due to blunt force head trauma associated with probable strangulation and drowning.

On January 14, 2013, in the presence of his retained attorney, Harris informed Erion through interpreter Bell that he wanted to make a revised statement. Harris gave Erion a handwritten statement concerning James' death. Erion did not question Harris about the revised statement; rather, the interview was postponed until the following day so that arrangements could be made to have Harris' own interpreter present. On January 15, Harris, in the presence of his attorney and with the assistance of his chosen interpreter, continued the interview. After giving Harris *Miranda* warnings, Erion questioned Harris.

In his January 15 interview and in the handwritten statement he had given Erion the previous day, Harris claimed that James had been alive when he arrived at the hotel room, but that she had apparently suffered a head injury and was upset. He stayed with James for a while and watched television while she slept. When she

8

woke, she was dizzy. She went to the bathroom, where she fell into the tub. The fall rendered James unconscious, so Harris put a pillow under her head and went to the hotel lobby to get help. When he returned to the room, he met Neil, who followed him in and pulled a gun on him. Neil dragged James out of the tub, checked on her, and then took her cell phone. Neil threatened to kill Harris if he told anybody what he had seen. After Neil left, Harris went to the gas station to call the police.

In addition to this evidence, the State also introduced prior acts evidence through the testimony of three women with whom Harris had been intimate. They each testified that Harris had physically abused them, including by strangling and punching them and by slamming them into walls.

1. Harris does not dispute the legal sufficiency of the evidence supporting his convictions. Nevertheless, as is this Court's practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize

a rational jury to find Harris guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (1) (673 SE2d 223) (2009) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citation and punctuation omitted)).

2. Harris contends that the trial court erred by allowing into evidence three of his four pre-trial statements, each of which is discussed in detail in subdivision 2 (b) below. He argues, inter alia, that the statements were not freely and voluntarily made and that the State failed to comply with the statutory requirements of OCGA § 24-6-653, concerning the procedure for interviewing people who are hearing impaired. For the following reasons, we apply the plain error standard of review and find no plain error in the admission of Harris' pre-trial statements.

(a) *Preservation of error*. In his appellate brief, Harris contends that his trial counsel and the prosecutor agreed that *any* claim of

error with respect to the admission of his statements would be preserved for appellate review. But because the record shows that any agreement between the prosecutor and trial counsel was insufficient to preserve for appellate review Harris' claims of error, all of which he raises for the first time on appeal, we review his claims for plain error only.

The record shows that Harris' trial counsel did not file a motion to suppress Harris' pre-trial statements; rather, the trial court scheduled a motions hearing and, during that hearing, the State informed the Court that "two motions [are] scheduled for today . . . and one of them is [for] a *Jackson-Denno* [hearing]." The State further informed the trial court that, "rather than doing an evidentiary hearing, what [defense counsel and the State have agreed] is that [the State] will lay the foundation by tendering some exhibits." Defense counsel voiced no objection to proceeding in this manner. During the State's proffer, defense counsel posed no objection to the admission of Harris' pre-trial statements and signed waiver-of-rights forms; moreover, he made no argument before the

11

trial court as to any legal basis for excluding the statements at trial. Instead, counsel announced that he would "remain mute."

After the State made its lengthy proffer, the prosecutor concluded: "I think you can see that there really is no . . . issue regarding *Miranda*, custodial statements versus non-custodial statements or voluntariness. I understand though that defense counsel doesn't want to waive anything, and I'm not suggesting they should." Thereafter, Harris' attorney did not contest the State's assertion that there was "no issue" as to the statements' voluntariness or admissibility, he did not rebut the State's proffer or make any argument, and he did not introduce any evidence. Instead, he admitted that the State's recitation of facts was accurate and that he did not disagree with the State's position. However, he asserted "I don't want to waive any issues relative to *Jackson-Denno*." Thus, the trial court's ruling was made entirely based on the State's proffer.[3] Then, at trial, defense counsel posed no objection to the

---

[3] The trial court found that Harris was "not in custody" when he made his handwritten and typed statements to Officer Figueroa. After reviewing the

statements as they were tendered into evidence. Finally, at the hearing on Harris' motion for a new trial, defense counsel testified that he was aware of no legal or factual argument that he could have advanced in support of a motion to suppress Harris' statements.

After a definitive ruling on the admissibility of a defendant's pre-trial statements following a *Jackson-Denno* hearing, a defendant is not required to renew his objections to the admission of those statements at trial to preserve for appellate review the objections previously made. OCGA § 24-1-103 (a) (1) provides:

> Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected and: . . . In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context[.]

---

evidence, the court concluded:

> After considering the totality of the circumstances, this Court finds by a preponderance of the evidence that Defendant was advised of and understood each of Defendant's *Miranda* rights [where applicable]; that after being advised of and understanding his *Miranda* rights, Defendant voluntarily waived his *Miranda* rights; and that after voluntarily waiving his *Miranda* rights, Defendant gave a statement to the police freely and voluntarily, without the slightest hope of benefit or fear of injury. Therefore, Defendant's statements given to the police on January 1, 2015, January 14, 2015, and January 15, 2015 shall be admissible during the trial of this case.

13

But when, as in this case, the trial court has neither been briefed on nor apprised of any specific objection to the admission of the defendant's statements, then the trial court cannot have made a definitive ruling with respect to the unmade objection. Moreover, the court's ruling did not relieve Harris of his obligation to object to the admission of his statements at trial. Only a definitive ruling on a specific objection relieves a defendant of his obligation to renew his objection when the evidence is later admitted. Id. See also *Anthony v. State*, 302 Ga. 546, 549 (II) (807 SE2d 891) (2017) ("In order to preserve an objection for [ordinary] appellate review, the specific ground of the objection must be made at the time the challenged evidence is offered."). In this case, the record shows that Harris' counsel made no objection whatsoever to the admission of Harris' pre-trial statements either in a written motion, at the motion hearing, or at trial. The fact that counsel and the prosecutor purportedly agreed that Harris was not waiving any objection to the admission of the statements is of no consequence under these

14

circumstances. OCGA § 24-1-103 (a) (1) requires, at a minimum, "a timely objection or motion to strike" to preserve appellate review of a ruling on the admission of evidence, and counsel may not avoid this statutory requirement through an agreement or stipulation. See *Heavey v. Security Mgmt. Co.*, 129 Ga. App. 83, 84 (198 SE2d 694) (1973) ("Parties may stipulate anything factual, and may sometimes waive the benefit of statutory or constitutional provisions, but they cannot by stipulation fix or change the law.") (citations omitted)). Consequently, because Harris did not make a specific objection at trial to the admission of his statements on the grounds now asserted in his appeal, we review these claims only for plain error.[4] See OCGA

---

[4] There are four prongs in the test for plain error.
First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

§ 24-1-103 (d). See also *Kemp v. State*, 303 Ga. 385, 397-398 (810 SE2d 515) (2018) (applying plain error standard of review to the appellant's unpreserved Confrontation Clause claim); *Lupoe v. State*, 300 Ga. 233, 243 (794 SE2d 67) (2016) (applying plain error review to the appellant's unpreserved hearsay claim).

(b) *Harris' pre-trial statements.* Harris challenges the court's ruling with respect to the admission of three of his four pre-trial statements: (i) the written statement given at the scene of the crime on January 1, 2013; (ii) the statement made at the police station with the assistance of interpreter Bell, also on January 1; and (iii) the handwritten custodial statement made on January 14, with the assistance of interpreter Bell and Harris' retained counsel.[5] We consider them each in turn.

(i) Harris contends that the written statement given to Officer

---

(Citations, punctuation and emphasis omitted.) *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011).

[5] Harris does not contend that the trial court erred in admitting his January 15 statements to Detective Erion. Rather, he contends that his trial counsel was ineffective for allowing him to be interviewed on this occasion. We address that claim of error in Division 3, below.

Figueroa at the crime scene should have been suppressed on the ground that it was not freely and voluntarily made because Harris was in custody at the time and he was not given the benefit of *Miranda* warnings. Harris also argues that, because the officer was required by OCGA § 24-6-653 to question him through a qualified interpreter, which he failed to do, the trial court was required to suppress the statement.

The trial court determined that Harris was not in custody during his interview with Figueroa and that, therefore, *Miranda* warnings were not required. See *Freeman v. State*, 295 Ga. 820, 822-823 (764 SE2d 390) (2014) ("*Miranda* warnings are required when a person is (1) formally arrested or (2) restrained to the degree associated with a formal arrest. Unless a reasonable person in the suspect's situation would perceive that he was in custody, *Miranda* warnings are not necessary." (citations and punctuation omitted)). Because the record does not contain any evidence that would support a finding that Harris had been arrested or that a reasonable person in Harris' position would have perceived that he was in

17

custody during his interaction with Figueroa, the trial court did not

err in determining that *Miranda* warnings were not required. See

id.

Further, OCGA § 24-6-653 did not require the trial court to

suppress Harris' statement under these circumstances.[6] A law

---

[6] OCGA § 24-6-653 provides:

(a)  An arresting law enforcement agency shall provide a qualified interpreter to any hearing impaired person whenever a hearing impaired person is arrested for allegedly violating any criminal law or ordinance of this state or any political subdivision thereof.

(b) (1)  Except as provided in paragraph (2) of this subsection, no interrogation, warning, informing of rights, taking of statements, or other investigatory procedures shall be undertaken upon a hearing impaired person unless a qualified interpreter has been provided or the law enforcement agency has taken such other steps as may be reasonable to accommodate such person's disability. No answer, statement, admission, or other evidence acquired through the interrogation of a hearing impaired person shall be admissible in any criminal or quasi-criminal proceedings unless such was knowingly and voluntarily given. No hearing impaired person who has been taken into custody and who is otherwise eligible for release shall be detained because of the unavailability of a qualified interpreter.

(2)  If a qualified interpreter is not available, an arresting officer may interrogate or take a statement from such person, provided that if the hearing impaired person cannot hear spoken words with a hearing aid or other sound amplification device, such interrogation and answers thereto shall be in writing and shall be preserved and turned over to the court in the event such person is tried for the alleged

18

enforcement agency is not *required* to provide a hearing impaired person with a qualified interpreter until the hearing impaired person "is arrested." See OCGA § 24-6-653 (a). The record shows that Harris had not been formally arrested when he communicated with Figueroa; consequently, at that moment, there was no "*arresting* law enforcement agency" that was required to provide Harris with a "qualified interpreter"[7] under OCGA § 24-6-653 (a) (emphasis supplied). And assuming that OCGA § 24-6-653 (b) applied to Harris, though he had neither been formally arrested nor found by the trial court to be in custody, the record also shows that Figueroa complied with paragraph (b) (1) by reasonably accommodating Harris' disability by communicating with him in writing, as it is undisputed that Harris can read and write the English language. The record supports the trial court's finding that Harris' statement to Officer Figueroa was freely and voluntarily made. Consequently,

---

offense.

[7] OCGA § 24-6-651 (6) provides: "'Qualified interpreter' means any person certified as an interpreter for hearing impaired persons by the Registry of Interpreters for the Deaf or a court qualified interpreter."

Harris has shown no error, much less plain error, in the admission of this statement.

(ii) When Harris made his January 1 statement at police headquarters, he had not yet been formally arrested. Prior to giving his statement, Harris read and signed a waiver-of-rights form. Detective Erion, through interpreter Bell, also read Harris his *Miranda* warnings. Harris contends that he could not have knowingly and intelligently waived his rights under these circumstances because Bell was not a qualified sign language interpreter and that she essentially "spoke a different language."[8] Harris argues that using Bell as an interpreter violated OCGA §§ 24-6-653 (b) (1) and  24-6-656.[9]  For these reasons, he argues that

---

[8] The record contains no evidence establishing Bell's professional qualifications as a sign language interpreter. During the *Jackson-Denno* hearing, the prosecutor stated that Bell was "capable of signing, though much of her signing is by spelling out words. . . . [F]or the record, she was capable of communicating with the defendant, but a lot of it was slow because she was having to spell things out." The video recordings of the interviews in which Bell participated show her signing with Harris, and the trial court could draw inferences from those interviews about whether they were able to effectively communicate with each other.

[9] OCGA § 24-6-656 provides:
Whenever a hearing impaired person shall be authorized to

20

this statement should have been suppressed.

Again, because Harris had not been formally arrested when he gave this statement, the law enforcement agency was not required to provide him with a qualified interpreter pursuant to OCGA § 24-6-653 (a). The record shows that Detective Erion nevertheless complied with OCGA § 24-6-653 (b) by reasonably accommodating Harris' disability by providing him with Bell's sign language assistance and by having Harris read his waiver-of-rights form and write down his statement.

Assuming, without deciding, that Harris' participation in the interview occurred under circumstances that were the equivalent of an arrest, such as during a custodial detention that required the giving of *Miranda* warnings, the record shows that Harris was

be provided a qualified interpreter, the agency or law enforcement agency shall determine whether the qualified interpreter so provided is able to communicate accurately with and translate information to and from the hearing impaired person. If it is determined that the qualified interpreter cannot perform these functions, the agency or law enforcement agency shall obtain the services of another qualified interpreter or shall appoint an intermediary interpreter to assist the qualified interpreter in communicating with the hearing impaired person.

21

informed of his *Miranda* rights before he was questioned. The video recording of this interview shows that Erion read the entire *Miranda* waiver-of-rights form to Harris and that Bell interpreted it in sign language. Harris nodded affirmatively as Bell signed to him, indicating that he understood. According to Bell, Harris wanted to communicate what he had seen. Harris also read and signed a waiver-of-rights form. During the course of the video-recorded interview, there is no indication that Harris could not read, that he did not understand the waiver-of-rights form, that he did not understand what he was being asked, or that he wished to stop the interview. The video recording supports the trial court's finding that Harris' statement to Detective Erion was made freely and voluntarily. Consequently, Harris has shown no error, much less plain error, in the admission of this statement.

(iii) When Harris and his defense counsel met with Detective Erion on January 14, Harris had been arrested and was in custody. Harris contends that Bell was not qualified to participate in this meeting and that her efforts to facilitate communications between

22

him, his attorney, and Detective Erion violated OCGA §§ 24-6-653 (b) (1) and 24-6-656, rendering his written statement involuntary and inadmissible.

The video recording of this interview shows that Harris initiated the interview through, and in the presence of, his defense counsel. Defense counsel informed Detective Erion that Harris wanted to explain why he had not been completely truthful with law enforcement previously. Harris was again advised of his *Miranda* rights through interpreter Bell, and Harris read and signed a waiver-of-rights form as his attorney watched. Harris even verbalized the word "yes" when Erion asked him if he wanted to talk to the police. Before receiving Harris' account through Bell, Erion inquired in writing whether Harris could understand Bell, to which Harris responded in writing "[s]omewhat[,] yes[,] mostly I don't use[ ] spelling words since my language is different from . . . National Deaf . . . Inst[itute]." Erion then asked Harris: "If you have any trouble, let me know?" Harris responded: "Will do."

Defense counsel, after conferring with Harris through the

interpreter, told Erion that his client had agreed to "take a stab at it," meaning giving his statement through Bell, and that if Harris had any trouble being understood, then counsel would intervene. Counsel indicated that he knew what Harris wanted to say. Thereafter, Harris began giving his account of events in sign language, and Bell translated the signs into spoken English. Erion, however, had a hard time following Harris because, as Bell translated Harris' signs into words, Harris also attempted to speak, which resulted in unintelligible cross-talk. After the detective complained that he was "not getting this," Harris' counsel intervened. Counsel pushed a pad of paper and a pen across the table and gestured for Harris to write down what he wanted the detective to know. Erion did not ask Harris any questions about the crime. For almost 30 minutes, Harris wrote out his statement. While Harris wrote, defense counsel made a call on his cell phone to arrange for Harris' interpreter to accompany him to the police station the following day and to help Harris answer any questions that Erion might have about the written statement.

Under these circumstances, Bell's involvement in the January 14 interview was harmless. First, it appears that Harris waived the requirements imposed by OCGA §§ 24-6-653 and 24-6-656 when he and his counsel requested this follow-up meeting and elected to "take a stab" at the interview with Bell interpreting.[10] Further, the written statement that Harris ultimately gave was not translated by Bell. It is clear from the video recording that Harris, in consultation with his attorney, had already made the decision to give the police a revised statement before the interview began. Harris read and signed a waiver-of-rights form in the presence of his attorney. Both Harris and his attorney clearly stated that Harris wanted to give the statement that he gave, and it is plain from the video recording that the statement was freely and voluntarily made. Consequently, Harris has shown no error, much less plain error, in the admission of this statement.

3. Harris contends that his trial counsel provided him with

[10] "If there is no constitutional, statutory, or public policy prohibition against waiver, an accused may validly waive any right." (Citation omitted.) *Thomas v. State*, 260 Ga. 262, 263 (392 SE2d 520) (1990).

ineffective assistance when he allowed him "to waive his Fifth Amendment right to remain silent and provide two separate interviews to police after being arrested." He argues that his attorney should not have allowed him to give a written statement to the police on January 14 or to follow up with the police on January 15 through his own interpreter. He argues that if his attorney had been accompanied by Harris' own interpreter on January 14, instead of Bell, he would have been better able to advise him not to sign the *Miranda* waiver form or to give his statements, which prejudiced him because the prosecution used the statements to show that Harris' account of events evolved to conform with the evidence as it was revealed to him.

To prevail on his claim of ineffective assistance of trial counsel, Harris must prove both that counsel's performance was professionally deficient and that he was prejudiced by this deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984); *Terry v. State*, 284 Ga. 119, 120 (2) (663 SE2d 704) (2008). To prove deficient performance, Harris must

show that his counsel performed in an "objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013). To prove prejudice, Harris "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U. S. at 694 (III) (B). "This burden is a heavy one." (Citation omitted.) *Young v. State*, 305 Ga. 92, 97 (5) (823 SE2d 774) (2019). And if Harris fails to show either deficiency or prejudice, this Court need not examine the other prong of the *Strickland* test. See *Palmer v. State*, 303 Ga. 810, 816 (IV) (814 SE2d 718) (2018).

At the hearing on Harris' motion for a new trial, defense counsel testified that he was retained by Harris' parents immediately after the arrest. The parents also retained a sign language interpreter to meet with Harris and his counsel on several occasions at the jail. During their visits, counsel advised Harris

through the interpreter not to speak with law enforcement or to make any written statements. The attorney "battled" with Harris and his parents over this point. Harris, however, insisted that he had done nothing wrong and that he wanted to clear up some things about which he had previously lied. Counsel "exhaustively" explained the risks of giving such a statement and repeatedly asked Harris to remain silent; nevertheless, Harris "insisted" on giving a statement. Harris committed his statement to paper during the January 14 interview because Detective Erion was having some difficulty following Harris, who was verbalizing his statement as Bell translated. When Harris returned on the following day with his own interpreter, he essentially confirmed what was in his written statement. The version of events recounted by Harris in his January 14 and 15 statements came to be the theory of defense at trial.

The record shows that counsel advised Harris not to give a custodial statement. Harris, however, rejected counsel's advice to remain silent and chose to give a custodial statement after being fully advised of the risks of doing so by counsel through his chosen

sign language interpreter prior to the January 14 interview. Consequently, Harris alone bears legal responsibility for any prejudice to his defense that resulted as a consequence of his custodial statement. Cf. *United States v. Teague*, 953 F2d 1525, 1532-1533 (11th Cir. 1992) ("A criminal defendant cannot be compelled to remain silent by defense counsel. . . . It is important to remember that while defense counsel serves as an advocate for the client, it is the client who is the master of his or her own defense." (citation omitted)). See also *People v Claudio*, 85 AD2d 245, 258 (III) (447 NYS2d 972) (1982) ("If a suspect insists on confessing, a defense attorney is not incompetent because he fails to stop him. The attorney should, of course, advise his client of the consequences, and take measures to limit his client's exposure, if possible.").

*Judgment affirmed. All the Justices concur.*

D<span></span>ECIDED J<span></span>ANUARY 13, 2020.

Murder. Cobb Superior Court. Before Judge Flournoy.

*The Merchant Law Firm, John B. Merchant III, Ashleigh B. Merchant*, for appellant.

*D. Victor Reynolds, District Attorney, Jesse D. Evans, John R. Edwards, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General*, for appellee.