**FIRST DIVISION**
**BARNES, P. J.,**
**LAND and WATKINS, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**March 11, 2024**

# In the Court of Appeals of Georgia

A23A1516. RUTHERFORD v. THE STATE.

WATKINS, Judge.

Barry Rutherford appeals from an order of the Superior Court of Candler County denying his amended motion for new trial after a jury found him guilty of one count each of rape, kidnapping, family violence aggravated assault, and family violence battery.[1] Rutherford argues that the evidence was insufficient to support his convictions, that the trial court plainly erred in admitting into evidence letters that he

---

[1] See OCGA §§ 16-6-1 (a) (1); 16-5-40 (a); 16-5-21 (a) (3); 16-5-23.1 (f). Rutherford was sentenced to consecutive sentences of life without parole for rape and kidnapping, a consecutive sentence of 20 years without parole on the aggravated assault charge, and a consecutive sentence of 12 months without parole on the battery charge.

had purportedly sent from jail, and that his trial counsel was ineffective. For the reasons set forth infra, we affirm.

Viewed in the light most favorable to the verdict,[2] the evidence shows that, on the evening of January 4, 2019, Rutherford lured his estranged wife, J. M., away from her family's home and into his vehicle, where he drove down dirt roads, beating her repeatedly and raping her, before he dropped her off in the area of her residence. J. M. testified that she and Rutherford had begun dating in February 2018 and that he was already abusive and controlling before they married in October 2018. J. M. left the marital home around Christmas of 2018 to stay with her mother.

On the evening in question, J. M. was visiting her sister, who lived a few doors down from her mother's home. After J. M. missed a number of calls from Rutherford, he demanded that she stay on the phone with him until he arrived at her sister's residence. When he arrived there, Rutherford told J. M. that he was not going to take her anywhere or touch her, but that he just wanted to talk.

While they sat in Rutherford's vehicle, J. M. told him that she no longer wanted to be with him. Rutherford then began punching her in the face, beginning what

---

[2] See *Rankin v. State*, 278 Ga. 704, 705 (606 SE2d 269) (2004).

ultimately resulted in a four-hour attack. Rutherford drove her to multiple locations, while beating her and making her take off her clothes and get into the backseat of his vehicle. After raping her, Rutherford left a naked and beaten J. M. in the dark on a dirt road before driving back minutes later and forcing her back into his car. He dropped her off near her home and fled, telling her not to call the police.

Upon seeing J. M. crying, bloody, and dirty, her sister immediately contacted their mother, who called 911. Deputy Brandon McGahee was the first responder on the scene, and the jury viewed the footage from his body camera. McGahee observed that J. M.'s shirt was inside out, that she was visibly shaking, and that she had significant swelling to her face. After J. M. was transported to the hospital, she told the deputy that she had sex with Rutherford so he would stop beating her.

J. M. received a sexual assault exam the next day around noon. Rutherford was ultimately arrested in Atlanta a couple of weeks later, and police obtained DNA evidence from buccal swabs from his cheek, which matched DNA taken from J. M.'s vaginal swabs.

At trial, the State presented testimony from J. M., J. M.'s sister, various medical personnel, police officers, the sexual assault nurse examiner ("SANE"), and an expert witness in sexual assault trauma.

After the jury found Rutherford guilty on all four charged counts, Rutherford filed an amended motion for new trial. Following an evidentiary hearing, the trial court denied the motion. This appeal followed.

1. Rutherford argues that the evidence was insufficient to support his convictions for rape and family violence aggravated assault.[3]

> When reviewing a defendant's challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the jury's verdict, and the defendant no longer enjoys the presumption of innocence. We do not weigh the evidence or determine witness credibility, but only determine if the evidence was sufficient for a rational

---

[3] Although Rutherford argues generally in his enumeration of errors that the State did not prove the essential elements of its case beyond a reasonable doubt, his brief does not address his kidnapping and battery convictions. Rutherford has thus abandoned any argument that the evidence was insufficient to support those convictions. See Court of Appeals Rule 25 (d) (1) ("Any enumeration of error that is not supported in the brief by citation of authority or argument may be deemed abandoned."); *Rider v. State*, 366 Ga. App. 260, 264 (1) n. 6 (883 SE2d 374) (2022) (holding that the appellant had abandoned any challenge to his drug-related convictions on sufficiency grounds where his appellate brief focused solely on his sex-related convictions).

trier of fact to find the defendant guilty of the charged offense beyond a reasonable doubt.[4]

(a) Rutherford contends that the evidence of rape was insufficient because there was no evidence in J. M.'s medical records indicating a sexual assault and because J. M. delayed reporting the rape, admitted at trial to having consensual sex with him four days before the date in question, and testified that she had sex "willingly" with him on the date in question so that he would stop beating her.

"A person commits the offense of rape when he has carnal knowledge of [a] female forcibly and against her will[.]"[5] "Carnal knowledge in rape occurs when there is any penetration of the female sex organ by the male sex organ. The fact that the person allegedly raped is the wife of the defendant shall not be a defense to a charge of rape."[6] "It is well established that a victim's testimony, without more, is sufficient to sustain a conviction for rape."[7]

---

[4] (Citations and punctuation omitted.) *Pye v. State*, 322 Ga. App. 125, 126 (1) (742 SE2d 770) (2013).

[5] OCGA § 16-6-1 (a) (1).

[6] OCGA § 16-6-1 (a).

[7] (Citation and punctuation omitted.) *Pye*, 322 Ga. App. at 128 (2); see also OCGA § 24-14-8 ("The testimony of a single witness is generally sufficient to

5

Here, J. M. testified that Rutherford drove her down a dirt road against her will and forced her back into the car when she attempted to escape, all while beating her with his fists and telling her that he was going to disfigure her face so that no one else would want her. After forcing her to take off her clothes, Rutherford got on top of J. M. in the backseat of the car and told her, "If you don't f*ck me right now, I'm going to keep beating your a***." When the prosecutor asked her, "[w]hy did you have sex with him?" J. M. testified in response: "So he would stop hitting me." J. M. also testified to a pattern of abuse and control leading up to the charged offenses.

On cross-examination, defense counsel asked J. M. why she did not initially report the rape to the responding officers and medical personnel. J. M. explained that she did report to the hospital doctors that she and Rutherford had sex during the encounter, but that she "didn't know that was considered rape, what he did, because [she] opened [her] legs." Further, the very next morning, she told the investigating officer that she had sex with Rutherford so that he would stop beating her. As a result of this report, the officer set her up with the SANE exam the same day.

_____

establish a fact.").

J. M.'s testimony alone is sufficient to sustain Rutherford's rape conviction. "[F]orce may be proved by direct or circumstantial evidence. Lack of resistance, induced by fear, is force, and may be shown by the victim's state of mind from her prior experience with the defendant and subjective apprehension of danger from him."[8] Further, "[t]o the extent that there was inconsistent testimony at trial, resolving evidentiary conflicts and inconsistencies and assessing witness credibility are the province of the fact finder, not the appellate court."[9]

Additionally, the State introduced expert testimony that it was not uncommon for sexual assault trauma survivors to have "disjointed" memories and to remember additional details later, when they were no longer in "survival mode." In light of the foregoing, as well as the DNA evidence mentioned above, we hold that the evidence was sufficient to support Rutherford's rape conviction.

(b) Rutherford also challenges the sufficiency of the evidence to support his conviction for family violence aggravated assault because J. M. did not tell Deputy

---

[8] (Citation and punctuation omitted.) *Bradberry v. State*, 297 Ga. App. 679, 861 (1) (678 SE2d 131) (2009).

[9] (Citation and punctuation omitted.) *Pauley v. State*, 355 Ga. App. 47, 53 (1) (842 SE2d 499) (2020).

McGahee she had been choked, McGahee did not see signs of trauma on her neck, and neither the EMS paramedic nor the SANE noticed any neck injuries.

Rutherford was indicted and convicted under OCGA § 16-5-21 (a) (3),[10] which defines aggravated assault as an assault "[w]ith any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in strangulation[.]" In this context, "'[s]trangulation' means impeding the normal breathing or circulation of blood of another person by applying pressure to the throat or neck of such person or by obstructing the nose and mouth of such person."[11] "[T]he use of hands to choke a victim can satisfy the deadly weapon or dangerous object element of aggravated assault."[12]

On direct examination, the prosecutor asked J. M. if Rutherford "put his hands around [her] throat at any point in time in this melee[.]" J. M. responded, "I can't remember. I'm pretty sure he did though."

---

[10] Because the offense was committed "between past or present spouses," Rutherford was charged with and convicted of family violence aggravated assault. See OCGA § 16-5-21 (i). Rutherford does not argue that he and J. M. were not married at the time of the offense.

[11] OCGA § 16-5-19 (11).

[12] *Goodrum v. State*, 335 Ga. App. 831, 832 (1) (783 SE2d 354) (2016).

While the EMS and hospital documents do not contain any reports of visible injury to J. M.'s neck, various medical personnel testified that it was possible for marks or bruising from strangulation to come later. The SANE, who examined J. M. sometime after noon on January 5, noticed that J. M. had a "spot" on her neck. The SANE testified further that, according to the checklist the SANE had filled out prior to the sexual assault exam, J. M. reported that Rutherford "used his fist, he was hitting, kicking, grabbing, pushing, punching, [and] *strangulation or choking*[.]"[13]

"As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld."[14] Here, the indictment alleged that Rutherford committed aggravated assault by assaulting J. M. "with his hand, an object which when used offensively against a person is likely to *result in strangulation* by squeezing her throat[.]"[15] "Thus, the State

---

[13] (Emphasis supplied.)

[14] (Citations and punctuation omitted.) *Maxwell v. State*, 348 Ga. App. 870, 873 (1) (825 SE2d 420) (2019).

[15] (Emphasis supplied.)

was . . . required to show that [Rutherford] used his hands in a manner likely to result in strangulation."[16]

Here, the State introduced evidence that J. M. was pretty sure Rutherford put his hands around her throat during the attack and that she reported "strangulation or choking" to the SANE the day after the attack. Viewed in the light most favorable to the verdict, the evidence is sufficient to support Rutherford's aggravated assault conviction.[17]

2. Rutherford contends that the trial court plainly erred in admitting into evidence letters that he purportedly sent from jail. Specifically, he argues that the State failed to lay a proper foundation for the admission of the letters such as the official jail policy concerning the screening of inmates' mail, further explanation regarding the witness's recognition of Rutherford's handwriting, and testimony regarding the dates the letters were intercepted and when Rutherford was incarcerated.

---

[16] *Maxwell*, 348 Ga. App. at 875 (1).

[17] See *Huff v. State*, 361 Ga. App. 559, 562 (2) (864 SE2d 706) (2021); *Goodrum*, 335 Ga. App. at 832 (1).

As Rutherford concedes, he did not object to the admission of the letters; thus, we review only for plain error.[18]

> There are four prongs in the test for plain error. First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.[19]

Here, the county jail supervisor testified that she "overs[aw] anything having to do with the jail[,]" including "jail mail[,]" and that it was the policy to screen all ingoing and outgoing mail (other than legal mail). She testified that she recognized Rutherford's handwriting, which was "pretty distinctive," on two letters that were

---

[18] See OCGA § 24-1-103 (a) (1), (d); *Allen v. State*, 347 Ga. App. 731, 735 (4) (820 SE2d 747) (2018).

[19] (Citation and punctuation omitted.) *Harris v. State*, 307 Ga. 657, 664 (2) (a) n. 4 (837 SE2d 777) (2020).

intercepted before mailing out and admitted into evidence at trial. One of the letters was dated February 20, 2021, and the other letter was undated. Over Rutherford's objection, the supervisor noted that Rutherford had not continuously been in jail between January 2019 (when he was arrested on the instant offenses) and February 2021.

OCGA § 24-9-901 (a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility shall be satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." One example conforming to this requirement is "[n]onexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation[.]"[20]

Rutherford has failed to show error, much less clear or obvious error. The jail supervisor testified that she was familiar with Rutherford's handwriting, and the letters referenced information concerning the case, specifically instructing the recipient on how to coach J. M. to testify in his favor. Accordingly, the State provided

---

[20] OCGA § 24-9-901 (b) (2).

12

sufficient evidence to establish a prima facie case that Rutherford wrote and attempted to send the letters.[21]

3. Finally, Rutherford argues that he was denied effective assistance of counsel because his trial attorney failed to impeach the victim's testimony with her own affidavit and admitted in closing argument that J. M. had been beaten, which "effectively amounted to a guilty plea" to the charges of assault and battery.

> To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant. To satisfy the deficiency prong, a defendant must show that

---

[21] See *McCammon v. State*, 306 Ga. 516, 523 (3) (832 SE2d 396) (2019) (holding that the State carried its burden to authenticate a document, even if the recipient was unfamiliar with the defendant's handwriting, where the note referenced key facts in the case and the recipient was talking to the defendant in an adjoining jail cell as the note was passed to him under the shared door); *Smith v. State*, 300 Ga. 538, 541 (2) (b) (796 SE2d 666) (2017) (the State established a prima facie case that the defendant wrote and sent the letters in question where the witness testified that he was familiar with the defendant's handwriting and that many of the letters were given directly to him by the defendant or delivered at his request, and where the content of the letters referenced information concerning the case); *Irving v. State*, 351 Ga. App. 779, 783-784 (2) (c) (833 SE2d 162) (2019) (holding that the State presented evidence sufficient to make out a prima facie case that the defendant wrote letters where the recipient "testified that he believed [the defendant] had written the letters because he recognized [the defendant's] handwriting and because the content of the letters and the circumstances surrounding his receipt of them in the jail indicated to him that they were from [the defendant]").

trial counsel performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms. This requires a defendant to overcome the strong presumption that trial counsel's performance was adequate. To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.[22]

(a) The charged offenses were alleged to have occurred in January 2019, and Rutherford was arrested later that month. As part of his motion for new trial, Rutherford introduced a February 2019 affidavit from J. M., in which she recanted her allegations and requested that the charges against him be dropped. Prior to trial, trial counsel filed an "extraordinary motion in limine," in which he requested an ex parte hearing to determine how to proceed as he had been presented with a "certain document[,]" the veracity of which was in question.

At the hearing on Rutherford's motion for new trial, trial counsel testified that he filed the motion in limine after the prosecutor's office advised that J. M. had been

---

[22] (Citations and punctuation omitted.) *Gaston v. State*, 307 Ga. 634, 636 (2) (837 SE2d 808) (2020).

paid to execute the affidavit recanting her accusations and because J. M. had refused

to submit to an interview with defense counsel.[23] Counsel testified further:

> So now I've got a Hobson's choice. The document has the whiff of fraud about it, which as an attorney, I cannot put a fraudulent document into court. However, I can't also directly confront the witness before court to verify completely that it's a fraudulent document. [Y]es, it would have been good to cross-examine the witness on her change of story. However, it could also be taken that this document has nothing to do with whether or not a rape had occurred. What I mean by that is this, 12 … jurors bringing their common sense to the courtroom and listening to the evidence in the courtroom could very well just say this is shenanigans that goes on whenever these kinds of allegations arise. And now we've got a document out there that causes just as bad a light on my client as it does on the alleged victim. And so at this point, given the fact that I still think it's a fraudulently procured document, I wasn't going to touch it.

"The extent of cross-examination is a strategic and tactical decision. Decisions

about cross-examination do not amount to deficient performance unless they are so

---

[23] See OCGA § 17-17-8.1 (a), (c) (Under the Crime Victims' Bill of Rights, if the victim has clearly expressed a desire not to speak to the accused or the accused's attorney or agent, "no contact shall be made.").

unreasonable that no competent attorney would have made them under similar circumstances."[24]

In light of trial counsel's concerns that J. M. would testify that she was paid to execute the affidavit recanting her accusations and that such testimony would cast a negative light on Rutherford, counsel's decision not to impeach J. M. with the affidavit was "a strategic or tactical decision by trial counsel and therefore does not constitute ineffective assistance of counsel absent a contrary showing."[25] Because Rutherford has failed to show deficient performance, we need not address the prejudice prong.[26]

---

[24] (Citations and punctuation omitted.) *Gaston*, 307 Ga. at 642 (2) (d).

[25] (Citation and punctuation omitted.) *Lewis v. State*, 351 Ga. App. 603, 606 (3) (a) (831 SE2d 837) (2019) ("Although another lawyer may have conducted the defense in a different manner and taken another course of action, the fact that [the defendant] and his present counsel disagree with the decisions made by trial counsel does not require a finding that [the defendant's] original representation was inadequate.") (citation and punctuation omitted).

[26] See *Fuller v. State*, 277 Ga. 505, 507 (3) (591 SE2d 782) (2004) ("[S]ince an appellant claiming ineffective assistance of counsel must show both deficient performance and actual prejudice stemming from that deficiency, an insufficient showing on either of these prongs relieves the reviewing court of the need to address the other prong.") (citation and punctuation omitted).

(b) Rutherford also argues that trial counsel was ineffective in his closing argument when he conceded that J. M. was "beaten."

During closing argument, counsel argued that the State had failed to prove beyond a reasonable doubt the charges for rape, kidnapping, and aggravated assault. He then stated, "I never denied it and won't ever deny it. She was beaten." Counsel then argued that J. M. had a motive to lie and concluded by arguing that the evidence was lacking on the rape, kidnapping, and aggravated assault charges.

At the motion for new trial hearing, counsel explained the battery charge was the only misdemeanor within the indictment. Counsel testified further:

> What you had there were facts that were put into evidence that showed [J. M.] was beaten. Now, you couldn't get away from that. You have to make an argument to a jury that is logical that a jury can follow, and you have to sway the jury to what you think the ultimate issue is, which is to keep [Rutherford] from getting a life without parole sentence which is where I was headed. And that's what I did.

> [T]actical decisions provide no grounds for reversal unless they are so patently unreasonable that no competent attorney would have chosen them. Here, trial counsel's strategic decision to basically admit the conduct underlying the [battery] allegations against [Rutherford],

17

and to argue that his actions amounted at most to the [misdemeanor offense], was eminently reasonable.[27]

"Because this portion of trial counsel's closing argument was a legitimate trial strategy or tactic, it fell within the bounds of reasonable professional conduct."[28]

*Judgment affirmed. Barnes, P. J., and Land, J., concur.*

---

[27] *Biggins v. State*, 299 Ga. App. 554, 557 (2) (683 SE2d 96) (2009).

[28] *Eackles v. State*, 270 Ga. 558, 561 (2) (b) (512 SE2d 635) (1999).