NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: August 21, 2023

S23A0559.  HENDERSON v. THE STATE.
S23A0720.  MASON v. THE STATE.

PINSON, Justice.

After a joint trial, Demetre Mason and Frankland Henderson were convicted of malice murder and other crimes in connection with the shooting deaths of Sonia Williams and Shaniqua Camacho.[1]

---

[1] The shootings occurred in the early morning hours of May 19, 2014. On August 26, 2014, a DeKalb County grand jury returned an indictment against Mason, Henderson, and five co-defendants: Michael Jenkins, Malcolm Brown, Jaimee Harrell, Katrina Shardow, and Traon Turk. Mason and Henderson were each charged with malice murder of Williams (Count 1), felony murder of Williams predicated on aggravated assault (Count 2), aggravated assault of Williams (Count 3), malice murder of Camacho (Count 5), felony murder of Camacho predicated on aggravated assault (Count 6), aggravated assault of Camacho (Count 7), armed robbery (Count 17), hijacking (Count 19), and violations of the Street Gang Terrorism and Prevention Act ("Gang Act") and the Racketeer Influenced and Corrupt Organizations Act predicated on those charges (Counts 4, 8, 18, 20, and 21). The trial court ordered that Mason, Henderson, and Jenkins be tried separately on Counts 1-8 (the malice murder, felony murder, aggravated assault, and Gang Act charges), and severed the remaining counts and defendants. The remaining counts against Mason and Henderson were later nolle prossed.

The case proceeded to a jury trial from April 16 to 26, 2018. Mason and

On appeal, Mason contends that the evidence was not sufficient to support his convictions for malice murder, and that the trial court should have held a hearing to determine whether evidence that, a month before the murders, Mason stole a handgun that was used in the shootings was admissible under Rule 403. But the evidence was sufficient as a matter of due process to sustain his convictions, and the trial court properly applied Rule 403 to the evidence that he stole the handgun. So we affirm Mason's convictions and

---

Henderson were convicted on all counts. Jenkins was convicted of the aggravated assault and Gang Act charges, but the jury deadlocked on the malice murder and felony murder charges. His case is not part of this appeal.

On June 14, 2018, Mason and Henderson were each sentenced to life in prison without parole for each of the two malice murder counts, to be served concurrently, and 15 years in prison for each of the two Gang Act counts, to be served consecutively, for a total sentence of life plus 30 years. The remaining counts merged for sentencing or were vacated by operation of law.

Mason timely moved for a new trial through new counsel on July 5, 2018, and amended that motion on September 12, 2022. After a hearing, the trial court denied the motion on December 2, 2022. Mason filed a timely notice of appeal on December 19, 2022.

Henderson filed a premature motion for new trial on May 29, 2018, before the trial court issued the final sentencing order. That motion ripened upon entry of the final disposition on June 14, 2018. See *Southall v. State*, 300 Ga. 462, 464-468 (1) (796 SE2d 261) (2017). Henderson later amended the motion, through new counsel, on September 13, 2022. After a hearing, the trial court denied the motion on December 2, 2022. Henderson filed a timely notice of appeal on December 22, 2022. Henderson's case and Mason's case were both docketed to the April 2023 term of this Court and submitted for decisions on the briefs. The cases have been consolidated for appeal.

sentence.

In a separate appeal, Henderson raises six claims. He contends that the admission at trial of Mason's out-of-court statement to police violated Henderson's rights under the Confrontation Clause of the Sixth Amendment; the trial court should have given an instruction limiting how the jury could consider Mason's out-of-court statement; the testimony of one witness for the prosecution, who he claimed was an accomplice, was insufficiently corroborated; the trial court should have excluded as hearsay testimony about statements from an associate of Henderson and Mason, because there was insufficient evidence to show that the statements were made in furtherance of a conspiracy so as to fall within a hearsay exception; the trial court abused its discretion in denying Henderson's motion to sever his case; and the trial court abused its discretion in admitting photos of Henderson making gang signs without proper authentication.

Each of Henderson's claims fails. Admitting Mason's out-of-

court statement did not violate the Confrontation Clause under *Bruton v. United States*, 391 U.S. 123 (88 SCt 1620, 20 LE2d 476) (1968), because it did not, standing alone, directly implicate Henderson. See *Pender v. State*, 311 Ga. 98, 110-111 (2) (b) (856 SE2d 302) (2021). It was not plain error to fail to give a limiting instruction about Mason's out-of-court statement, because the absence of the instruction is unlikely to have affected the outcome of the trial. No corroboration was needed for the testimony of the witness Henderson claims was an accomplice, because there was ample evidence from which the jury could find that she was *not* an accomplice. The out-of-court statements of Henderson's associate were properly admitted under the hearsay exception for statements in furtherance of a conspiracy because the evidence was sufficient to establish that Henderson and his associate conspired to commit the murders and to participate in a criminal street gang. The trial court was not required to sever Henderson's trial, because there was little possibility of confusing evidence or law, there were no antagonistic defenses, and the evidence

admitted at the joint trial that might not have been admitted if Henderson was tried alone was not prejudicial enough to show a denial of due process. And, finally, the photos of Henderson making gang signs were not admitted in error because they were authenticated by a police investigator who was familiar with them.

1. Recounted in the light most favorable to the verdicts, the evidence at trial showed the following.

(a) In May 2014, Mason and Henderson were living on Maypop Lane in DeKalb County with Michael Jenkins, Jaimee Harrell, Katrina Shardow, Malcolm Brown, Frederick Rosenau, and Brandi Singleton. All except Singleton were members of the Nine Trey Gangsters, a subset of the Bloods gang. Singleton was not a gang member, but she was familiar with the gang and was in a sexual relationship with Brown. The highest ranking gang member in the house was Rosenau, followed by Brown, followed by Harwell. Below Harwell were Mason, Henderson, and Jenkins, who were all of the same rank.

On the night of May 18 to 19, 2014, Mason brought his girl-friend, Williams, and Williams's friend, Camacho, to the house. Williams had been there once before, and she and Brown did not get along. On this occasion, Mason, Williams, Camacho, Singleton, Rosenau, and Brown all went to an upstairs bedroom. Brown asked Mason why he kept bringing Williams over, since Williams had "too much mouth." Brown began pulling at Williams's clothing, hair, and body. Williams objected and told Brown that he was "acting like a b***h." Brown replied, "Oh, I'm acting like a b***h." Brown then left the room and went downstairs. Mason tried to leave with Williams at that point, but Rosenau told him they "[weren't] going to leave like that."

Downstairs, Brown told Harwell and Shardow to "[g]o get" Williams. Brown then returned to the bedroom with Harwell and Shardow, along with Henderson and Jenkins. Harwell moved aggressively toward Williams and threatened her. Williams responded that Harwell "wasn't going to touch her." Harwell hit Williams in

6

the face, and then Harwell and Shardow both began beating Williams. Brown encouraged the beating. Mason did not intervene.

After about ten minutes, Harwell and Shardow let Williams get up. Williams was "screaming and cursing" and asking Mason why he had not helped her. Harwell and Shardow then picked her up and dragged her down the stairs. Williams did not want to leave without her shoes and her purse, but Harwell and Shardow threw her out the front door. At that point, Camacho, Williams's friend, tried to retrieve Williams's belongings and to leave with Williams, but Harwell held onto Williams's purse. Camacho told everyone it was "nice to meet them" and was allowed to leave.

Outside the house, Williams had not left the property. She was pounding and kicking at the front door, screaming that she would "bring some GDs"—meaning Gangster Disciples, a gang that was not friendly with the Bloods—to "come and shoot up the place." Brown told Mason, "You need to control your b****h." Brown said that if Williams brought a group of Gangster Disciples to the house, there would be a problem. Eventually Williams stopped shouting

and pounding on the door, and she and Camacho left.

Brown ordered Mason, Henderson, and Jenkins to go find the two women. Brown confirmed that the three were armed, and instructed them, "Make sure that y'all do what y'all need to do and make sure that [Mason] does what he need to do because he acting like he in love." The three men, all carrying guns, left in a car. Brown stayed back at the house, but he was in communication with the three while they were out, urging them to find Williams and Camacho and asking to be kept apprised of what Mason, in particular, was doing.

Five or ten minutes later, the three men returned. Henderson reported to Brown: "Yeah, we did that. They flatlined. It's over with." Brown asked several times if Henderson was sure that nobody would "come back to this door," and Henderson kept repeating that "they flatlined" and "it was over with."

Brown instructed everyone to delete any pictures they had with Williams on Instagram. Harwell and Shardow riffled through Williams's purse and then burned it. The following day, Harwell and

Singleton threw away some of Williams's other belongings at an elementary school down the street.

(b) At 4:14 a.m. on May 19, 2014, Alyssia Smith, who lived near the house on Maypop Lane, was awakened by the sound of gunfire. Smith checked to make sure her children were safe and then went back to bed. The next morning, as she was walking to her car, Smith noticed two female bodies on the ground. Smith told her fiancé, and they called 911.

The responding officers identified the victims as Williams and Camacho. A medical examiner later determined that both women had died from multiple gunshot wounds. A .40-caliber bullet and a .38-caliber bullet were recovered from Williams's body. Officers also found seven spent Federal .40-caliber Smith & Wesson shell casings near the bodies.

Investigating officers obtained Williams's phone number from her family and requested her phone records. The records showed that on May 18 and May 19, Williams's phone was in contact multiple times with a phone number ending in -5686. Officers learned

9

that the subscriber associated with the -5686 number was Mason. Officers also learned that on May 19—the day after the murders— the 5686 account was canceled and a new number was assigned to the same phone.

Mason became a suspect. On May 30, he was arrested at the Maypop Lane home. A search of the home revealed a red bandana, a red notebook containing a written oath, and a number of electronic devices, including Mason's phone. Officers then got a search warrant for Mason's phone and learned that Mason had exchanged a series of text messages on May 19 with someone named "Turk." Among those messages were an incoming text from Turk that read, "Who was it"; a reply from Mason's phone saying, "She had to go Blood. I bust that a** four times each on Blood on DaMobb"; a message from Turk asking, "With what strap"; and Mason's answer, "Mine."

Officers interviewed Mason. The interview was recorded, and some of it was played for the jury. Mason initially claimed that he had been in Florida on the night of the murders. But when police

confronted him with his text message exchange with Turk, his statement changed. Mason told police that he was ordered by Brown to kill Williams and Camacho. Mason denied actually shooting the victims, but admitted he was at the scene as the driver.

Separately, a few days before Mason's arrest, Singleton came forward and told police what happened at the Maypop Lane home on the night of the murders. Based on the information from Singleton, officers got arrest warrants for Henderson, Jenkins, and Brown. About two months after Singleton spoke to police, Mason called her and asked her not to testify in court.

(c) At trial, the jury heard evidence about one of the murder weapons. No weapon was ever found, but Mason told police in his interview that one of the guns used in the shooting was stolen from Douglas County. A trial witness, Amber Diamond, testified that in April 2014 (about a month before the murders), she, Mason, and two other men—including co-indictee Traon Turk—had stolen a gun and ammunition from her ex-boyfriend's house in Douglas County. The ex-boyfriend, Teddy Brucker, also testified at trial and confirmed

11

that his .40-caliber Ruger handgun was stolen from his Douglas County home in April 2014.

Ballistics evidence connected Brucker's gun to the murders. Brucker testified that he reported the theft of his gun to police. He also explained that when he bought the gun, it came with a pre-fired spent shell casing that could be used for comparison purposes. Brucker said he turned that spent shell casing over to police. Officers later compared that casing to the spent shell casings that were recovered at the crime scene, and determined that they were fired from the same weapon.

(d) Investigator Waine Pinckney, who was qualified as an expert in street gangs, testified extensively at trial.

Pinckney first explained generally about gang structure and culture. He said that within the larger Bloods gang were a number of subsets, including the subset involved in this case, the Nine Trey Gangsters. Nine Trey Gangsters, like other subsets of the Bloods, use the color red, and members sometimes signal their affiliation with a red "flag," typically a bandana worn on the wrist or neck, or

in the left pocket. The gang has a distinct organizational structure. At the top is the "OG" or "godfather." Below that are several "floors," or levels of rank, known as the "fifth floor," "fourth floor," and so on. And below the floors are captains, sergeants, and foot soldiers. It is understood within the gang that a lower-ranking member must follow orders from a higher-ranking member.

Pinckney also testified about the evidence of gang involvement in this case. He noted that Mason had tattoos that indicated his involvement in the Bloods, including a five-pointed star and the letters M-O-B, which stood for "member of Blood." Photos of Mason showed him wearing a red bandana and making the gang sign "C-K," which stands for "Crip killer," referring to a rival gang of the Bloods. Other photos showed Henderson making Blood gang signs. In addition, notebooks recovered from inside the Maypop Lane home contained gang terminology and records of gang members' attendance at meetings and payment of dues. Another notebook from the house contained a written oath swearing loyalty to the Nine Trey Gangsters; a similar oath was found in Mason's cell phone. Text messages from

Mason's phone shared gang information, including rules for membership.

Based on all of that evidence, Pinckney concluded that Mason and Henderson were members of the Nine Trey Gangsters subset of the Bloods. Pinckney further concluded that the way that the crime was committed—with Brown ordering Mason, Henderson, and Jenkins to carry out the killings—indicated that it was a gang activity.

No defendant testified at trial.

*Case No. S23A0720*

2. Mason contends that the evidence at trial was constitutionally insufficient to support his convictions for malice murder. See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). We evaluate a due process challenge to the sufficiency of the evidence by viewing the evidence presented at trial in the light most favorable to the verdicts, and asking whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Peacock v. State*, 314 Ga. 709, 714 (2) (b) (878 SE2d 247) (2022). "We

14

leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts." *Perkins v. State*, 313 Ga. 885, 891 (2) (a) (873 SE2d 185) (2022) (citation and punctuation omitted).

A person is guilty of malice murder if "he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." OCGA § 16-5-1 (a). See also *Welch v. State*, 306 Ga. 470, 473 (1) (831 SE2d 761) (2019). A jury may find a defendant guilty of malice murder if the evidence shows beyond a reasonable doubt either that he directly committed the crime or that he was a "party thereto." OCGA § 16-2-20 (a). A person is a party to a crime if, among other things, he aids or abets in its commission. Id. § (b) (3). See also *Carter v. State*, 314 Ga. 317, 319 (2) (a) (877 SE2d 170) (2022). "[P]roof of a shared criminal intent with the actual perpetrator is necessary to establish that one is a party to the crime," *Sams v. State*, 314 Ga. 306, 310 (2) (875 SE2d 757) (2022) (citation and punctuation omitted), and the jury may infer a shared criminal intent from the defendant's "presence, companionship, and conduct

before, during, and after the offense," *Jones v. State*, 314 Ga. 214, 232 (3) (875 SE2d 737) (2022) (citation and punctuation omitted).

The evidence here was sufficient to support Mason's convictions for malice murder. Mason admitted that he was at the scene of the shootings. He was connected to one of the murder weapons through his statement to police, ballistics evidence, and the testimony of Amber Diamond and Teddy Brucker. His text messages to Turk showed him bragging about the murders after the fact. And Singleton's testimony narrated how Brown ordered Mason, Henderson, and Jenkins to carry out the murders. Given that evidence, a rational jury was authorized to find beyond a reasonable doubt that Mason shot at least one of the victims and that he was a party to the shooting of the other victim. And even if Mason was merely the driver and did not personally shoot either victim, as he told police, the jury could find that he shared a criminal intent with the shooters, particularly given his messages to Turk claiming that "She had to go" and "I bust that a** four times." See, e.g., *Meadows v. State*, 316 Ga. 22, 24-25 (2) (885 SE2d 780) (2023) (evidence sufficient to

16

support conviction for malice murder when evidence showed that the defendant arranged to meet the victim at a certain location and went to that location with the victim and a third man, the victim was shot by either the defendant or the third man, the defendant fled the scene, and the defendant owned a gun consistent with the murder weapon); *Jones*, 314 Ga. at 232 (3) (evidence sufficient to support conviction for malice murder as party to the crime when evidence showed that the defendant belonged to a street gang and had a motive to kill the victim, was present at the scene of the shooting, and was in contact with the shooter before and after the crime). This claim therefore fails.

3. Mason also contends that the trial court should not have admitted evidence about Mason's alleged theft of the .40-caliber handgun a month before the murders. In Mason's view, the trial court failed to ensure that the probative value of the theft was not substantially outweighed by its prejudicial effect. See OCGA § 24-4-403 ("Rule 403"). We review a trial court's evidentiary rulings for abuse of discretion. See *Jones v. State*, 305 Ga. 653, 655 (2) (827 SE2d 254)

17

(2019).

Relevant evidence, although generally admissible, see OCGA § 24-4-402, may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." See OCGA § 24-4-403. But the exclusion of evidence under Rule 403 is "an extraordinary remedy that should be used only sparingly." *Wilson v. State*, 315 Ga. 728, 738 (8) (883 SE2d 802) (2023) (citation and punctuation omitted). The "major function" of the rule is to "exclude matter of scant of cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Hood v. State*, 299 Ga. 95, 103 (4) (786 SE2d 648) (2016) (cleaned up).

Mason argues on appeal that the trial court should have conducted a "hearing" to determine whether the alleged theft of the handgun satisfied Rule 403. But nothing in the rule or our case law requires a hearing; the role of the trial court in applying Rule 403 is simply to "undertake in each case a considered evaluation of the proffered justification for the admission" of evidence and then "make an independent determination" whether the evidence satisfies the

rule. *State v. Orr*, 305 Ga. 729, 737 (3) (827 SE2d 892) (2019) (citation and punctuation omitted). And here the trial court did just that. When Mason tried to exclude the handgun theft, the trial court ruled that "any prejudice to [Mason] is far outweighed by the relevance that the issue may determine this evidence [of the alleged handgun theft] to have." Although the trial court did not use the exact wording of Rule 403, its finding reflected the "considered determination" that the trial court had to make. See id.

And that determination under Rule 403 was not an abuse of the trial court's discretion. Evidence that Mason stole the handgun was certainly probative, because it directly connected Mason to the murder weapon. See *Jordan v. State*, 313 Ga. 841, 845-845 (2) (b) (874 SE2d 67) (2022) (evidence that machine gun and ammunition were stolen four months before murder, that they were the same caliber used in the murder, and that the defendant's known associate lived next door to where the burglary occurred, satisfied Rule 403); *Harris v. State*, 313 Ga. 225, 233 (4) (869 SE2d 461) (2022) (photo of defendant holding a type of gun that could have been used

19

in the charged crime a week before the shooting satisfied Rule 403). As to prejudice, evidence of the theft may have been prejudicial to Mason—as all incriminating evidence is, see *Morgan v. State*, 307 Ga. 889, 897 (3) (c) (838 SE2d 878) (2020) (noting that inculpatory evidence is "inherently prejudicial")—but the question is whether there was a danger of *unfair* prejudice that substantially out-weighed probative value. Unfair prejudice generally refers to the tendency of evidence to "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged," or to "suggest decision on an improper basis." *Old Chief v. United States*, 519 U.S. 172, 180 (II) (B) (1) (117 SCt 644, 136 LE2d 574) (1997) (citation and punctuation omitted). See also *Wilson*, 315 Ga. at 738 (8). Here, unfair prejudice could have resulted if evidence of the handgun theft led the jury to believe that Mason had an immoral character or a propensity to commit crimes, and to convict him on that "improper basis." But that possibility is small given the ample evidence that authorized the jury to convict Mason for permissible reasons. And again, the probative value of the handgun theft was

substantial: it related directly to the crime Mason was charged with committing. The trial court therefore did not abuse its discretion in admitting the evidence.[2]

*Case No. S23A0559*

4. Henderson advances two related claims of error about Mason's recorded out-of-court statement to police, an edited version of which was played at their joint trial. First, he claims that admitting the edited statement violated his Confrontation Clause rights under *Bruton.* Second, he claims that even if admitting the statement did

---

[2] In his brief, Mason also cites OCGA § 24-4-404 (b) ("Rule 404 (b)"), which limits the admissibility of evidence about a defendant's other bad acts. It is not clear from the trial transcript whether the handgun theft was proffered or admitted as Rule 404 (b) evidence. Mason initially sought to prevent the State from introducing the handgun theft under Rule 404 (b) on the ground that the State had not filed the necessary pretrial notice. See OCGA § 24-4-404 (b) (requiring the prosecution to "provide reasonable notice to the defense in advance of trial . . . of the general nature of any [Rule 404 (b)] evidence"). But the State argued that the theft of the handgun was intrinsic evidence, not subject to Rule 404 (b), and the trial court suggested it agreed. Then, the trial court—in denying Mason's motion in limine—found that "under 404 (b) and the balancing act [sic], any residual or any prejudice to [Mason] is far outweighed by the relevance that the issue may determine this evidence to have." But we need not decide whether the evidence properly came in under Rule 404 (b) or as intrinsic evidence, because Mason's arguments on appeal are limited to the question whether the trial court properly applied Rule 403.

21

not violate his rights under *Bruton*, admitting the statement without instructing the jury to consider the statement only against Mason violated his Confrontation Clause rights.

(a) The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. This right is ordinarily satisfied by allowing the defendant to cross-examine a witness whose testimonial statements are admitted against him. See *United States v. Owens*, 484 U.S. 554, 558-559 (II) (108 SCt 838, 98 LE2d 951) (1988); *State v. Gilmore*, 312 Ga. 289, 292-293 (2) (b) (862 SE2d 499) (2021).

But joint criminal trials introduce a complication. In a joint trial, the State may seek to present an incriminating out-of-court statement of a *co-defendant*. The complication? The co-defendant whose statement is introduced has, and often will assert, the right under the Fifth Amendment's Self-Incrimination Clause not to testify. See, e.g., *Fitts v. State*, 312 Ga. 134, 140 (2) (859 SE2d 79) (2021). But if the co-defendant asserts that right, the defendant who

is implicated by the statement would be unable to cross-examine the witness who would testify against him—a clear-cut violation of the defendant's rights under the Confrontation Clause. See id.

The longstanding "solution" to this Fifth Amendment-Sixth Amendment conflict is a limiting instruction: The trial court admits the co-defendant's statement but instructs the jury to consider it only against the co-defendant. With that instruction in place, the co-defendant "ordinarily . . . is not considered to be a witness 'against' [the] defendant," *Samia v. United States*, 599 U.S. __, __ (II) (143 SCt 2004, 2012, __ LE2d __) (2023) (quoting *Richardson v. Marsh*, 481 U.S. 200, 206 (II) (107 SCt 1702, 95 LE2d 176) (1987)), so the Confrontation Clause does not apply, and the statement may be admitted.

But it is not quite so simple. This limiting-instruction fix puts a great deal of faith in the jury's ability to consider the co-defendant's statement against the co-defendant, but to ignore it entirely when considering the guilt or innocence of the defendant. To be sure,

23

jurors are instructed all the time in our legal system to compartmentalize in this way—to consider certain evidence only for specific purposes, see, e.g., *Jones v. State*, 311 Ga. 455, 462 & n.6 (3) (a) (858 SE2d 462) (2021) (jury instructed to consider evidence of defendant's other acts only to show intent), or to disregard evidence that they were not supposed to hear, see *Meadows*, 316 Ga. at 26 (4) (a) (jury instructed to disregard prosecutor's remark that gun used in shooting was not presented as evidence at trial); *Gude v. State*, 313 Ga. 859, 869-870 (5) (874 SE2d 84) (2022) (jury instructed to disregard detective's opinion that defendant's alleged action was "cold"). And it is "the almost invariable assumption of the law that jurors follow their instructions." *Richardson*, 481 U.S. at 206 (II). But only "almost." In *Bruton*, the U.S. Supreme Court explained that when the out-of-court statement of a co-defendant who "stands accused side-by-side with the defendant" is "powerfully incriminating" against the defendant in a joint trial, the "risk that the jury will not, or cannot, follow" a limiting instruction is too great. 391 U.S. at 135-136. In such cases, a limiting instruction is not an "adequate substitute

24

for [the defendant's] constitutional right of cross-examination," and so the admission of the co-defendant's statement can violate the defendant's Confrontation Clause rights. Id. at 126, 137.

The *Bruton* rule, however, has proved narrow. In *Richardson*, the Court clarified that *Bruton* does not apply to a statement that "[i]s not incriminating on its face, but bec[omes] so only when linked with evidence introduced later at trial." *Richardson*, 481 U.S. at 208 (II). The Court reasoned that when a jury has to link such a statement with other evidence and then "infer" guilt, "it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence." Id. And in *Samia*, the Court held that the Confrontation Clause "[i]s not violated by the admission of a nontestifying codefendant's confession that [does] not directly inculpate the defendant and [i]s subject to a proper limiting instruction." *Samia*, 143 SCt at 2018 (no Confrontation Clause violation when an officer testified that Samia's co-defendant confessed about "a time when the *other person* he was with pulled the trigger" and otherwise referred to an "other person," and the trial court instructed the jury that the

co-defendant's confession should be considered only against the co-defendant).

This recent holding aligns with our Court's prior precedent applying *Bruton*. We have consistently held that *Bruton* excludes only a statement of a non-testifying co-defendant that, standing alone, "directly inculpates" the defendant, *Simpkins v. State*, 303 Ga. 752, 755 (II) (814 SE2d 289) (2018) (quoting *Thomas v. State*, 300 Ga. 433, 439 (2) (a) (3) (796 SE2d 242) (2017)), but not an out-of-court statement that does not incriminate the defendant unless "linked with other evidence at trial," *Simpkins*, 303 Ga. at 756 (II) (citation and punctuation omitted); see *Pender*, 311 Ga. at 110-111 (2) (b) (statements that became incriminating about defendant only when linked with other evidence about defendant's involvement in the crimes did not violate *Bruton*). That means that "[t]he fact that the jury might infer from the contents of the co-defendant's statement in conjunction with other evidence, that the defendant was involved does not make the admission of the co-defendant's statement a violation of the Confrontation Clause." *Hanifa v. State*, 269 Ga. 797,

803-804 (2) (505 SE2d 731) (1998), disapproved on other grounds by *Clark v. State*, 315 Ga. 423 (883 SE2d 317) (2023). So, for instance, a statement that refers to the declarant and "another individual" committing the crime does not violate *Bruton*'s rule, see *Simpkins*, 303 Ga. at 756 (II), but a statement that refers to the defendant by nickname, refers to all other individuals by name, makes clear that one name has been redacted, and refers to the crime as having been committed by "someone" or "others" or "they," could, see *Hanifa*, 269 Ga. at 804 (2).

(b) Turning to Henderson's claims, we start with his *Bruton* claim. Particularly in the light of *Samia*, that claim fails.[3] Before trial, the State and trial counsel worked together to cut from Ma-

---

[3] The State contends that this claim should be reviewed only for plain error because it was not preserved for appellate review: although Henderson objected to the admission of Mason's out-of-court statement at trial, he did not object on the same basis that he does now. The State further contends that Henderson's claim fails under plain-error review because it was affirmatively waived, because Henderson did not renew his objection despite having several opportunities to do so. But we need not decide whether the claim was preserved, not preserved, or even affirmatively waived because, for the reasons given in the text, the claim fails under either ordinary appellate review or plain error review.

son's recorded statement any mention of his co-defendants (Henderson and Jenkins) by name or nickname. What was left cannot be said to have "directly inculpated" Henderson, see *Samia*, 143 SCt at 2018. As relevant here, Mason said that someone pointed a gun at him and "threatened for them to do it and me to drive." And he said that "we had to go find" the two women, "we jumped in the car," and, later, "[t]hey pulled behind me, there were like where the f**k y'all goin, turn back around . . . they told me to get out of the car, we got out of the car and then boom it happened." So Mason described himself and a number of unspecified other people carrying out the murders, referring to "we," "us," "they," or "them." But nothing in the statement itself indicated that one of those other people was Henderson in particular, as opposed to any of the other gang members mentioned in the course of the trial (or, indeed, anyone else). Especially compared to the co-defendant's confession in *Samia*—which described only a single "other person" and thus could be more readily understood to refer to Samia specifically—Mason's statement was

not directly inculpatory of Henderson to the degree required to establish a violation of the *Bruton* rule. That the jury could have inferred that Mason was referring to Henderson based on Singleton's testimony and the fact that Henderson was a co-defendant is not enough to violate his Confrontation Clause rights under *Bruton*. See *Morris v. State*, 311 Ga. 247, 255 (3) (857 SE2d 454) (2021) (no *Bruton* violation when co-defendant's out-of-court statement "only incriminate[d] [defendant] when combined with other evidence presented at trial"); *Pender*, 311 Ga. at 110-111 (2) (b); *Simpkins*, 303 Ga. at 756 (II); *Hanifa*, 269 Ga. at 803-804 (2). Henderson's *Bruton* claim fails on the merits.

(c) Henderson has a second Confrontation Clause claim. He contends that even if admitting the statement did not violate his rights under *Bruton*, it still violated his Confrontation Clause rights because the jury was never instructed to consider the statement only against Mason.

Henderson did not ask for a limiting instruction at trial, so we review this claim only for plain error. See OCGA § 17-8-58 (b); *Ash*

*v. State*, 312 Ga. 771, 791 (5) (a) (865 SE2d 150) (2021). To show plain error, a defendant has to show not merely error, but that the error (1) was not affirmatively waived, (2) was obvious beyond reasonable dispute, and (3) affected the appellant's substantial rights, which ordinarily means showing that the error affected the outcome of the trial. See *Moore v. State*, 315 Ga. 263, 272-273 (4) (882 SE2d 227) (2022). If those three requirements are satisfied, an appellate court has the discretion to remedy the error only if the error "seriously affected the fairness, integrity, or public reputation of judicial proceedings." Id. at 273 (4) (cleaned up).

We agree that not giving a limiting instruction was error. As we recounted above, the longstanding practice of admitting a non-testifying co-defendant's statement or confession in a joint trial avoids Confrontation Clause problems only because the trial court instructed the jury to consider it only against the co-defendant. See *Samia*, 143 SCt at 2018; *Richardson*, 481 U.S. at 211 (II); *Colton v. State*, 292 Ga. 509, 511 (2) (739 SE2d 380) (2013) ("[a] co-defendant's

statement meets the Confrontation Clause's standard for admissibility when it does not refer to the existence of the defendant *and* is accompanied by instructions limiting its use to the case against the confessing co-defendant") (citation and punctuation omitted; emphasis added). Without that instruction, a co-defendant who makes a testimonial statement or gives a confession that incriminates the defendant remains a "witness against him," and absent a chance to cross-examine the co-defendant, the defendant's Confrontation Clause rights are violated. See *Crawford v. Washington*, 541 U.S. 36, 51-53 (III) (A), 68 (124 SCt 1354, 158 LE2d 177) (2004) (an out-of-court statement is a statement from a "witness" against the defendant—and thus subject to the Confrontation Clause—when it is "testimonial" in nature, which includes statements made during police interrogations); *Davis v. State*, 272 Ga. 327, 331-332 (2) (528 SE2d 800) (2000) (violation of Confrontation Clause to admit co-defendant's out-of-court statement without limiting instruction even when defendant's name was redacted); *Hanifa*, 269 Ga. at 801-802 (2).

But Henderson has not shown plain error because he has not shown that the lack of instruction likely affected the outcome of the trial. First, even without Mason's out-of-court statement, the evidence against Henderson was quite strong. Singleton's narrative testimony described in detail how Henderson, Mason, and Jenkins armed themselves and left the house to look for the victims, and how, when they returned, Henderson repeatedly assured Brown that the victims had "flatlined." Singleton's story was corroborated in part by Mason's text messages to Turk. And Investigator Pinckney gave his expert opinion that Henderson was a member of the gang. Compared to that evidence, Mason's statement was unlikely to have carried as much weight. For one thing, the statement did not obviously implicate Henderson: not only did Mason not mention Henderson by name or nickname, but his references to "they" and "them" reasonably could have referred to any of the other gang members who were known to the jury and were known to be involved in the killings. Moreover, the jury might have afforded less weight to Mason's statement if it believed the statement was self-serving and

designed to minimize Mason's own culpability. See *Samia*, 143 SCt at 2014 (II) (B) (noting that "jurors may cast a critical eye on accomplice testimony—and, in particular, self-serving accomplice testimony . . . that accuses another of the most culpable conduct"). That is especially likely here, where Mason's statement to police (in which he contended he was only the driver) was contradicted by his text messages to Turk (in which he boasted of committing at least one killing himself with his own gun).

Given the otherwise strong case against Henderson, the admission of Mason's statement was unlikely to have affected the outcome of the trial, so Henderson's claim of plain error fails. See *Morris*, 311 Ga. at 256 (4) (assuming without deciding it was error to admit co-defendant's out-of-court statement without a limiting instruction, the error likely did not affect the outcome of trial given that the statement did not directly identify the defendant and there was other substantial evidence of guilt); *Lupoe v. State*, 300 Ga. 233, 250 (16) (794 SE2d 67) (2016) (defendant did not show harm required for plain error from admission of testimony about the defendant's gang

33

membership that may have violated the Confrontation Clause, in light of substantial other evidence of the defendant's gang membership).

6. Next, Henderson contends that there was not sufficient evidence to corroborate the testimony of Brandi Singleton, who he contends was an accomplice to the crimes. See OCGA § 24-14-8 (the testimony of a single witness is not sufficient to establish a fact when the witness is an accomplice); *Payne v. State*, 314 Ga. 322, 326 (1) (877 SE2d 202) (2022) ("[A] jury may not rely solely on an accomplice's testimony to find any fact necessary to sustain a defendant's felony conviction. Instead, the existence of any such fact must also be supported either by the testimony of an additional witness or by other, independent evidence that corroborates the accomplice's testimony.") (citation and punctuation omitted).

(a) At trial, Singleton testified about her relationship to the Nine Trey Gangsters. She said that she was not a member of the gang, but that she had family who were members and so she was familiar with the gang's culture. She came to stay at the Maypop

34

Lane house voluntarily and was in a sexual relationship with Brown. But she soon grew uncomfortable, and on the night of the murders she was trying, unsuccessfully, to get away. Several times that night, she texted with a man she described as her boyfriend (not Brown) because she wanted to leave. She did so in secret because she was afraid Brown would beat her up or kill her. She continued to text her boyfriend in the days after the murder. During that time she was not able to leave on her own because Brown kept a close watch on her: he took her phone, and he would not let her leave the house unless a member of the gang was with her. One time that Singleton was allowed to leave the house with a gang member was the day after the murders, when she went with Harwell to throw away Williams's belongings. Singleton testified that during that excursion she was nervous and "texting to get away."

Eventually, Singleton escaped by texting her boyfriend's mother and asking the mother to send her a text pretending that something was wrong with Singleton's son and asking Singleton to come to the hospital. When Singleton received that text, she used it

as a pretext to get a ride to the hospital, where she met her boyfriend's mother and went with her instead of back to the Maypop Lane house.

The trial court's instructions to the jury included these charges:

> The testimony of [an] accomplice alone is not sufficient to warrant a conviction. The accomplice's testimony must be supported by other evidence of some type and that evidence must be such as would lead to the inference of the guilt of the accused independent of the testimony of the accomplice.
>
> [ . . . ]
>
> The sufficiency of the supporting evidence of an accomplice is a matter solely for you, the jury, to determine. Whether or not any witness was [an] accomplice is a question for you, the jury, to determine from the evidence in this case.

(b) "The testimony of a single witness is generally sufficient to establish a fact." OCGA § 24-14-8. But there is an exception to that general rule: in felony cases where the only witness is an accomplice, "the testimony of a single witness shall *not* be sufficient," id. (emphasis added), and "a jury may not rely solely on an accomplice's

testimony to find any fact necessary to sustain a defendant's conviction," *Payne*, 314 Ga. at 326 (1). Whether or not a witness was an accomplice to the crime is a question for the jury to decide, as are any issues of credibility that might affect that finding. See *Copeland v. State*, 314 Ga. 44, 48 (2) (875 SE2d 636) (2022). If the evidence at trial would authorize a properly instructed jury to find that a witness was *not* an accomplice, that finding "eliminate[s] the need for corroboration under OCGA § 24-14-8," and the witness's testimony alone is sufficient. Id. (citation and punctuation omitted). This is true even if there is conflicting evidence as to whether the witness was an accomplice, see *Johnson v. State*, 311 Ga. 221, 225 (857 SE2d 463) (2021) ("Despite some evidence to the contrary presented at [the defendant's] trial, a properly instructed jury could have found that [a witness] was not an accomplice, and corroboration of his testimony therefore was not required."), and even if the only evidence that a witness is not an accomplice is the witness's own testimony, see *Fisher v. State*, 309 Ga. 814, 819 (2) (848 SE2d 434) (2020) (properly charged jury was authorized to believe witness's testimony

37

that he had no prior knowledge of crime, and thus to determine that witness was not an accomplice, which eliminated the need for corroboration).

Here, Singleton was the only witness testifying to much of what happened at the house on Maypop Lane, but ample evidence authorized the jury to conclude that Singleton was not an accomplice. She testified that she was not a member of the gang. She testified extensively about her fear of the gang, and of Brown specifically. She talked about how Brown controlled her movements and communications. And she detailed her days-long effort to get away, even while she had left with Harwell to throw away Williams's belongings. All of that authorized a conclusion that Singleton did not have a "shared criminal intent" with the defendants. See *Sams*, 314 Ga. at 310 (2); *Johnson*, 311 Ga. at 225; *Fisher*, 309 Ga. at 819 (2). And the jury was properly charged with the pattern jury instructions on accomplice corroboration, including the charge that "[w]hether or not any witness was an accomplice is a question for you, the jury, to determine for the evidence in this case." See

38

*Copeland*, 314 Ga. at 48 (2) (noting that that instruction was correct). Given the proper instruction and the ample evidence supporting a finding that Singleton was not an accomplice, no corroboration under OCGA § 24-14-8 was necessary. This claim thus fails.

7. Henderson contends that the trial court abused its discretion by allowing Singleton to testify about certain things that Malcolm Brown said on the night of the murders. The trial court admitted Singleton's testimony, over counsel's objection, under OCGA § 24-8-801 (d) (2) (E) ("Rule 801 (d) (2) (E)"), which is the hearsay exception for statements made in furtherance of a conspiracy. Henderson now contends that the testimony should have been excluded because there was insufficient evidence of a conspiracy. He identifies ten of Brown's remarks that, in his view, were admitted in error: (1) his comment to Mason that Williams had "too much mouth"; (2) his sarcastic retort to Williams that "Oh, I'm acting like a b***h"; (3) his direction to Mason to "control your b***h"; (4) his direction to the defendants to find Williams and Camacho; (5) his direction to make sure the defendants had guns; (6) his direction to "make sure that

39

y'all do what y'all need to do and make sure [Mason] does what he need to do because he acting like he in love"; (7) his request to the defendants to "make sure you let me know what [Mason] does"; (8) his instruction that "y'all need to find them"; (9) his question, "what is [Mason] doing"; and (10) his instruction, "they on foot."

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." OCGA § 24-8-801 (c). Hearsay is generally inadmissible, but it may be admitted if any of several statutory exceptions applies. See id. § 802; *Mosley v. State*, 307 Ga. 711, 716 (3) (838 SE2d 289) (2020). One of those exceptions is Rule 801 (d) (2) (E), which allows for the admission of "[a] statement by a co-conspirator of a party during the course and in furtherance of the conspiracy, including a statement made during the concealment phase of a conspiracy." OCGA § 24-8-801 (d) (2) (E). See *Kemp v. State*, 303 Ga. 385, 392 (2) (b) (810 SE2d 515) (2018). To introduce hearsay under Rule 801 (d) (2) (E), the State must show by a pre-

ponderance of the evidence that a conspiracy existed, that the conspiracy included both the declarant and the defendant against whom the statement is offered, and that the statement was made during the course of and in furtherance of the conspiracy. See *Stafford v. State*, 312 Ga. 811, 822 (5) (a) (865 SE2d 116) (2021); *Kemp*, 303 Ga. at 392 (2) (b).[4]

As with admissibility rulings generally, we review a trial court's ruling to admit evidence under Rule 801 (d) (2) (E) for an abuse of discretion. See *State v. Lane*, 308 Ga. 10, 20 (3) (838 SE2d 808) (2020). As part of this review, we accept a trial court's factual findings unless they are clearly erroneous. See *Kemp*, 303 Ga. at 393 (2) (b). And we have noted before that a trial court's determination "whether a statement was made in furtherance of a conspiracy" is a factual finding reviewed for clear error. Id. Further, in reviewing that determination, "[w]e apply a liberal standard." Id.

A conspiracy is "an agreement between two or more persons to

---

[4] Although conspiracy is itself a crime, see OCGA § 16-4-8, a conspiracy need not be separately charged for a statement to be admissible under Rule 801 (d) (2) (E). See OCGA § 24-8-801 (d) (2) (E); *Kemp*, 303 Ga. at 392 (2) (b).

commit a crime." *Jones v. State*, 305 Ga. 750, 752 (2) (a) (827 SE2d 879) (2019). When, as here, a defendant is charged under the Street Gang Terrorism and Prevention Act ("Gang Act") with committing a crime in furtherance of the purposes of a criminal street gang, he may be part of two conspiracies: the immediate conspiracy to commit the crime, and the "larger criminal conspiracy" to participate in the gang. *Chavers v. State*, 304 Ga. 887, 893 (3) (823 SE2d 283) (2019); *Kemp*, 303 Ga. at 393 (2) (b) (i). This is because a criminal street gang is essentially "a general conspiracy among several individuals to commit crimes." *Kemp*, 303 Ga. at 394 (2) (b) (i). See also OCGA § 16-15-3 (3) & (1) (J) (a "[c]riminal street gang" is "any organization, association, or group of three or more persons associated in fact, whether formal or informal, which engages in criminal gang activity," and "[c]riminal gang activity" includes, among other things, any crime involving violence or the possession or use of a weapon); *Kemp*, 303 Ga. at 394 (2) (b) (i) (to show a violation of the Gang Act, the State must prove the existence of a criminal street gang and "the commission of a specific criminal act intended to further the gang's

criminal purposes"). And because a criminal street gang is a kind of general conspiracy, "[m]anagement of or participation with others in that criminal street gang activity necessarily implies knowledge of the gang's criminal activities and a specific intent to further its criminal purposes." *Rodriguez v. State*, 284 Ga. 803, 807 (1) (671 SE2d 497) (2009). So if a person is a member of a criminal street gang, his statements in furtherance of the gang's criminal purposes are considered statements in furtherance of the "larger conspiracy"—and thus could be admissible under Rule 801 (d) (2) (E), assuming the rule's other requirements are satisfied.

Most of Brown's remarks that Henderson now challenges were clearly in furtherance of the conspiracy to murder Williams and Camacho and, by extension, of the "larger conspiracy" to participate in the Nine Trey Gangsters. The State presented ample evidence that Brown and Henderson were members of the Nine Trey Gangsters, including Singleton's testimony, Investigator Pinckney's expert opinion, and the photos of Henderson making gang signs. The State also presented evidence that killing Williams and Camacho

43

furthered the gang's purposes: Singleton and Mason said Brown, a high-ranking member, ordered Henderson, Mason, and Jenkins, all lower-ranking members, to kill Williams and Camacho, and Singleton and Pinckney both explained this was because Williams was threatening to bring Gangster Disciples, a rival of the Bloods, to the house. Many of Brown's statements challenged here were direct instructions to Henderson and his co-defendants to carry out that killing: to arm themselves, find the women, and "do what y'all need to do." And other statements were requests for confirmation that Mason was following those instructions. All of those remarks easily meet the "liberal standard" that applies in determining whether a hearsay statement is in furtherance of a conspiracy. See *Kemp*, 303 Ga. at 393 (2) (b); *Chavers*, 304 Ga. at 893 (3) (declarant's statements targeting someone to be beaten or killed and telling a fellow gang member that the victim did not know "how real the s**t is about to get," together with evidence that defendant was critical of the victim and spoke about killing violators of gang rules, that declarant and defendant were in gang, and that declarant met with defendant just

44

before defendant killed victim, showed that declarant and defendant conspired to murder victim and that they were part of "larger criminal conspiracy" to participate in the gang) (citation and punctuation omitted).

Certain of Brown's statements arguably were not in furtherance of any conspiracy. His remark that Williams had "too much mouth" and his sarcastic retort to Williams that "Oh, I'm acting like a b***h" were unrelated either to the murders or to participation in the Nine Trey Gangsters. But those statements were not hearsay, because they were not offered to prove the truth of the matters asserted. See OCGA § 24-8-801 (c). Because they were not hearsay, they did not need to qualify for a hearsay exception to be admissible, and Henderson does not object to Brown's statements on any other basis.

Because each of the statements Henderson challenges was either in furtherance of a conspiracy and thus admissible under Rule 801 (d (2) (E), or not hearsay at all, his claim that these statements were inadmissible hearsay fails.

8. Henderson contends that the trial court should have granted his pretrial motion to sever his trial from the trials of his co-defendants. We review the denial of a motion to sever for abuse of discretion. See *Collins v. State*, 312 Ga. 727, 736 (4) (864 SE2d 85) (2021).

When two or more defendants are indicted jointly for a capital felony where the death penalty has been waived, for a non-capital felony, or for a misdemeanor, the defendants can be tried together or separately in the discretion of the trial court. See OCGA § 17-8-4 (a). A trial court has "broad discretion" to grant or deny a motion for severance. *Sillah v. State*, 315 Ga. 741, 750 (3) (883 SE2d 756) (2023). When ruling on the motion to sever, a trial court should consider three factors: "(1) the likelihood of confusion of the evidence and law; (2) the possibility that evidence against one defendant may be considered against the other defendant; and (3) the presence or absence of antagonistic defenses." *Collins*, 312 Ga. at 735 (4) (citation and punctuation omitted). To show that severance is required, the defendant must do more than point to the presence of antagonistic defenses or the possibility that he has a better chance of acquittal

46

in a separate trial. See id. Rather, he must show that "a joint trial was so prejudicial as to amount to a denial of his right to due process." *Hurston v. State*, 310 Ga. 818, 826 (3) (a) (854 SE2d 745) (2021) (citation and punctuation omitted).

Here, the first and third factors weighed against severing the trials. The jury was not likely to be confused about the evidence or the law because all three co-defendants—Henderson, Mason, and Jenkins—were accused of the same conduct, and the State argued that they acted together in committing the crimes. See *Sillah*, 315 Ga. at 750 (3) (severance not necessary when, among other things, "the law and evidence were substantially the same for all of" the gang-member co-defendants); *Collins*, 312 Ga. at 736 (4) (confusion of evidence and law unlikely because "the three co-defendants were charged with the same offenses stemming from the same incident with largely the same evidence") (citation and punctuation omitted). For the same reason, there were no antagonistic defenses at trial. The three co-defendants were accused of the same conduct, and none of their defenses were inconsistent or relied on blaming one another.

See *Collins*, 312 Ga. at 737 (4) (severance not required when there was "sufficient evidence of a common scheme or plan to commit a criminal offense") (citation and punctuation omitted).

The second factor is closer. The State's case against Henderson was not quite as strong as its case against Mason, both as to the murders and as to membership in the gang. Some of the evidence against Mason, like his text messages with Turk or the gang-related information from his phone, might not have been admitted at a trial of Henderson alone. And it is conceivable that some of that evidence, particularly about Mason's gang connections, might have been imputed to Henderson.

But that is not enough to require severance. "[T]he fact that the evidence as to one of the co-defendants is stronger does not demand a finding that the denial of a severance motion is an abuse of discretion" when, as here, "there is evidence showing that the defendants acted in concert." *Smith v. State*, 308 Ga. 81, 86-87 (2) (839 SE2d 630) (2020) (citation and punctuation omitted). See also OCGA § 16-2-20 (explaining party-to-the-crime liability). And the State

48

presented independent evidence that Henderson was a gang member (Singleton's testimony, Investigator Pinckney's expert opinion, the photos of Henderson making gang signs) and that he was involved in the murders (Singleton's testimony), all of which still would have been admissible had Henderson been tried alone. Given all of this, even if Henderson may have had a better chance of acquittal in a solo trial, he has not shown that his "joint trial was so prejudicial as to amount to a denial of his right to due process." *Hurston*, 310 Ga. at 826 (3) (a). See *Collins*, 312 Ga. at 735 (4). The trial court thus did not abuse its discretion in denying the motion to sever.

9. Finally, Henderson contends that the trial court abused its discretion by admitting photos of Henderson making gang signs because they were not properly authenticated. Authentication is reviewed for abuse of discretion. See *Harris v. State*, 313 Ga. 872, 880 (4) (874 SE2d 73) (2022).

During Investigator Pinckney's testimony, the State sought to introduce photos that showed Henderson making gang signs, either

49

alone or with his co-defendants. Pinckney initially testified that he recognized the photos as coming from "a social media account," that some came from the Charlotte-Mecklenburg Police Department in North Carolina, and that he recognized the people in them. Defense counsel objected that there was a lack of foundation and identification for the photos. Pinckney then testified that he recognized the photos and that he recognized the people in them.

Evidence like photos may be authenticated with evidence "sufficient to support a finding that the matter in question is what its proponent claims." OCGA § 24-9-901 (a). Authentication may be achieved through any means that satisfies that statutory standard. See *Nicholson v. State*, 307 Ga. 466, 475 (5) (837 SE2d 362) (2019). That can include the "[t]estimony of a witness with knowledge that a matter is what it is claimed to be." OCGA § 24-9-901 (b) (1). See *McCammon v. State*, 306 Ga. 516, 522-523 (3) (832 SE2d 396) (2019). When authenticating evidence, the proponent must "present evidence sufficient to make out a prima facie case that the proffered evidence is what it purports to be." *McCammon*, 306 Ga. at 523 (3)

(citation omitted). Once that prima facie case is established, the evidence is admitted, "and the ultimate question of authenticity is decided by the jury." Id. (citation omitted). These rules apply to electronic documents the same as they do to any others. See *Nicholson*, 307 Ga. at 475 (5).

The photos here were authenticated by Investigator Pinckney, who testified that he was familiar with them and with the people in them. See OCGA § 24-9-901 (b) (1); *McCammon*, 306 Ga. at 522-523 (3). That established a prima facie case of authenticity that allowed the photos to be admitted. See OCGA § 24-9-901 (a); *McCammon*, 306 Ga. at 523 (3). The ultimate question of authenticity was then for the jury. See *McCammon*, 306 Ga. at 523 (3). Thus, the trial court did not abuse its discretion in admitting the photos, and so this claim fails.

*Judgments affirmed. All the Justices concur.*